UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
------------------------------------------------------x
TYMAR DISTRIBUTION LLC, DISPLAY
NAME: NEW ENGLAND EXPRESS,

                 Plaintiff,

      - against -

MITCHELL GROUP USA, LLC; RIVELLE
PRODUCTS, INC.; and TIMOTHY MICHAEL
FRAILLY,

                 Defendants.
------------------------------------------------------x

**MEMORANDUM & ORDER**
20-CV-719 (PKC) (SJB)

PAMELA K. CHEN, United States District Judge:

Plaintiff Tymar Distribution LLC, Display Name: New England Express, brings this action

against Defendants Mitchell Group USA LLC; Rivelle Products, Inc. d/b/a PricePRO; and

Timothy Michael Frailly for violations of the Sherman Antitrust Act ("Sherman Act") and tortious

interference with existing and prospective economic relations in violation of New York state law.

Defendants have moved to dismiss this action for lack of personal jurisdiction and venue, and

failure to state a claim. For the reasons stated herein, Defendants' motions are granted, and this

case is dismissed.

## BACKGROUND

I.    **Factual Background[1]**

    A.    **The Parties**

Plaintiff is a Rhode Island domiciliary and limited liability company. (Second Amended

Complaint for Damages ("SAC"), Dkt. 30, ¶ 25.) Plaintiff operated continuously as a third-party

---

[1] For purposes of this motion, the Court accepts as true the following facts alleged in the Second Amended Complaint. *See Forest Park Pictures v. Universal Television Network, Inc.*, 683 F.3d 424, 429 (2d Cir. 2012).

seller on Amazon[2] from 2014 up to the time of the events at issue in this suit.  (*Id.*)  As a third-party seller, Plaintiff routinely listed approximately 300 brand names on Amazon and sold over 150,000 units of product.  (*Id.* ¶ 50.)  During its "last six months of unimpaired 2018 Amazon operations," Plaintiff made $425,498 in sales.  (*Id.*)  Plaintiff's profit margin on Fair & White ("F&W") products—which are at issue in this suit—was 22.1%.  (*Id.*)

Defendant Mitchell Group USA LLC ("MGU") is a Delaware[3] limited liability company with its domicile and principal place of business in Miami, Florida.  (*Id.* ¶ 28.)  MGU is the exclusive United States distributor of "certain French-made personal products," including F&W products.  (*Id.*)  Defendant MGU also sells F&W products directly to customers through its own Amazon merchant store called "Beauty Dreams."  (*Id.*)

Defendant Rivelle Products, Inc. ("Rivelle") is a duly formed corporation that is domiciled in California.  (*Id.* ¶ 26.)  Defendant Frailly is President of Rivelle.  (*Id.* ¶ 13.)  Since 2016, Rivelle, like Plaintiff, operated as a third-party seller of beauty products on Amazon, using the "unregistered fictitious name" PricePRO.[4]  (*Id.* ¶¶ 26, 53.)  Rivelle served as the exclusive distributor of some or all of MGU's approximately 50 F&W products listed on Amazon, and also

---

[2] References to Amazon refer to both the company Amazon.com, Inc., as well as the retail website amazon.com.

[3] Although the SAC states that MGU is a Florida limited liability company (SAC, Dkt. 30, ¶ 28), MGU is actually a Delaware limited liability company.  (Motion to Dismiss ("MGU's Motion"), Dkt. 52, at 3 n.1.)

[4] Although Plaintiff refers to Defendant Rivelle as "PricePRO" throughout the SAC, the Court will refer to this Defendant as "Rivelle" and "Defendant Rivelle."

provided "brand protection services"[5] for MGU. (*Id.* ¶¶ 26–27.) Plaintiff alleges that, at all relevant times, Rivelle was "an actual or potential competitor on Amazon of MGU." (*Id.* ¶ 16.)

## B. The "Grey Market" for Third-Party Sellers on Amazon

Amazon controls at least 47% of all e-commerce in the United States and, therefore, "serves as essential infrastructure for third party sellers in the United States." (*Id.* ¶¶ 38, 40.) As a third-party seller on Amazon, Plaintiff operates in the so-called "grey market" by re-selling products sourced at wholesale from manufacturers or authorized distributors "outside of the manufacturer's authorized trading channels" at an "enhanced, retail price point online, but often at a cheaper price than other sellers," to the benefit of customers "who get authentic product at a discount." (*See id.* ¶¶ 4, 44–45.) According to Amazon's policies, "it is completely lawful for third-party sellers to purchase grey market goods and sell them on Amazon." (*Id.* ¶ 46.) Moreover, Amazon permits multiple sellers to list their products for sale on the same product detail page, as long as the products "exactly match." (*Id.* ¶ 34.) In practice, this "generates intense price competition that is highly beneficial to consumers." (*Id.* ¶ 35.)

Amazon's policies expressly prohibit third-party sellers from violating the intellectual property rights of others by, for example, listing counterfeit, expired, defective, or otherwise inferior product on an existing product detail page.[6] (*Id.* ¶ 36.) According to these policies, following a report of a violation and before it takes any action, Amazon must determine whether

---

[5] The Court understands "brand protection" to refer to the recognized practice of brands reporting intellectual property infringement to Amazon, sometimes through brand protection agencies or agents. (*See* SAC, Dkt. 30, ¶¶ 57, 57 n.19.)

[6] Product detail pages are often created by a trademark holder, copyright holder, or affiliate who has "agreed to compete with 'unauthorized' sellers on the product detail page." (SAC, Dkt. 30, ¶ 46.) Amazon's policies instruct sellers to report violations if they believe that a product listed on a detail page is not an exact match, and therefore, improperly listed. (*Id.*; *see also id.* ¶ 34.)

the reported item infringes on another seller's rights.[7]  (*Id.*)  If Amazon determines its policies have been violated, it may "block the [product] listing or, in certain circumstances, terminate the third-party seller."  (*Id.*)  Before becoming a third-party seller on Amazon, Plaintiff executed a Business Solutions Agreement that would "allow[] Amazon to terminate [P]laintiff's selling privileges as a seller for any reason or for no reason at all."  (*Id.* ¶ 49.)  In general, Amazon may "unilaterally restrict any seller from competing in the [Amazon] Marketplace and take such other unilateral actions as Amazon in its business judgment deems appropriate."  (*Id.* ¶ 43.)

### C.    Plaintiff is Eliminated as a Third-Party Seller of F&W Products

In March 2018, Defendants Rivelle and MGU executed a two-year "Distribution Agreement," wherein ███████████████████████████████████████████████ ████████████████████████████  ████████  █████████████████████████  (Dkt. 67, at ECF[9] 4–12.)  Defendant Frailly signed the Distribution Agreement on behalf of Rivelle.  (*Id.* at ECF 12.)  Plaintiff alleges that Rivelle also served as MGU's "Amazon brand protector," by lodging complaints on behalf of MGU against "other 'unauthorized' (competing) sellers," thereby "causing the listings of lower-priced [products] . . . to be 'taken down'" and ensuring "horizontal

---

[7] Plaintiff alleges that while Amazon "publicly holds out that it requires evidence of infringement for each product that it is asked to take down," in reality, its "lax[]" approach to implementing these policies "allow[s] unscrupulous Rightsowners" to limit price competition by challenging legal grey market practices.  (SAC, Dkt. 30, ¶ 36.)  Amazon is not a party to this action, although many of Plaintiff's grievances appear to be aimed at Amazon for maintaining a system that Plaintiff views as turning a blind eye to and permitting anticompetitive behavior.

[8] The Distribution Agreement produced during jurisdictional discovery is highly redacted, including redaction of the definition and description of which products are covered by the agreement.  (Dkt. 67, at ECF 4–12.)

[9] Citations to "ECF" refer to the pagination generated by the Court's CM/ECF docketing system and not the document's internal pagination.

price protection."[10]  (SAC, Dkt. 30, ¶¶ 56–58, 66.)  According to Plaintiff, these "price protection services l[ie] at the heart of this case."  (*Id.* ¶ 58.)  MGU created and provided the email address "ecommerce@mitchellgroupusa.com" (herein "ecommerce" email address) to Rivelle "for use in corresponding with e-commerce sites regarding [MGU]'s products and brands."  (Dkt. 63-1, at ECF 22–23.)  Plaintiff alleges that Rivelle used this email address to "anonymously accomplish its unlawful purpose" as a brand protector for MGU.  (SAC, Dkt. 30, ¶ 57; *see also id.* ¶ 57 n.19.)

In May 2018, Plaintiff made the first of several purchases of F&W products from MGU.  (*Id.* ¶ 61.)  At no time did MGU tell Plaintiff that it would be limited or prohibited from selling F&W products on Amazon.  (*Id.* ¶ 60.)  Between May 17 and October 18, 2018, Plaintiff sold approximately $28,350 worth of F&W products purchased from MGU.  (*Id.* ¶ 51.)  Plaintiff "did not repackage, modify, or otherwise change the product for resale" (*id.* ¶ 8); rather, it sold "completely authentic" F&W products on Amazon "at prices at or below MGU's pricing" (*id.* ¶ 51).

On or about June 22 or 23, 2018, MGU began making intellectual property ("IP") complaints against Plaintiff to Amazon, alleging copyright and trademark infringement with respect to F&W products.  (*Id.* ¶ 64.)  On June 24, 2018, Plaintiff sent a message to MGU's "ecommerce" email address demanding withdrawal of two allegedly false IP complaints.  (Dkt. 67, at ECF 23–24.)  The email, which was received by MGU employee Linda Patty, was forwarded to Defendant Frailly, who responded to Patty, ████████████████████████████████████████████████████ ████████████████████████████████████████████████████████████ ███████████████████████████████████████████████  (*Id.* at ECF 23.)

---

[10] Plaintiff "believes" other competitors, such as "Mega Foundation," were "similarly driven" from selling F&W products on Amazon by these tactics.  (SAC, Dkt. 30, ¶ 59.)  However, Plaintiff does not plead any facts in support of this allegation.

Around this time, Plaintiff retained New York-based, "expert Amazon counsel, Rosenbaum & F[a]m[u]laro ('R&F') to intercede with MGU" on Plaintiff's behalf.[11]  (SAC, Dkt. 30, ¶ 65; *see also id.* ¶ 15.)  On June 27, 2018, R&F emailed a letter from attorney Anthony Famularo to MGU's "ecommerce" email address, disclaiming and demanding retraction of complaints against Plaintiff.  (Dkt. 67, at ECF 18–21.)  Godfrey Barboza of MGU forwarded this letter to Defendant Frailly, noting, ████████████████████████████████████████████████████████

████████████████████████████████████████████████████████ (*Id.* at ECF 25.)  Someone[12] responded to Famularo ████████████████████████████

████████████████████████████████████████████████████████

████████ (*Id.* at ECF 28.)  Famularo replied that he would relay the proposal and requested clarification on the complaints, which was provided.  (*Id.* at ECF 26–28.)  When Famularo later followed up with MGU[13] regarding the complaints, Barboza forwarded the email to Frailly, who responded, ████████████████████████ (*Id.* at ECF 26.)

Throughout July 2018, MGU filed more than a dozen IP complaints with Amazon accusing Plaintiff of counterfeiting.  (*See* SAC, Dkt. 30, ¶¶ 68–72.)  Per Amazon's policy, the F&W listings identified in these complaints were "taken down," and then, after Plaintiff produced invoices

---

[11] The Court assumes that Plaintiff is referring to the law firm Rosenbaum, Famularo & Segall PC.  *See* https://rosenbaumfamularo.com/about/ (last visited Mar. 23, 2021).  The Court nonetheless will refer to the law firm as "R&F."

[12] It is unclear whether this email response was by Frailly, someone on his "legal team," or someone else altogether.  However, given Barboza's email, and viewing the facts in the light most favorable to Plaintiff, the Court assumes that the response was sent by someone at Rivelle on behalf of MGU.  (*See* Dkt. 67, at ECF 25.)

[13] The Court assumes that, as of the time of these emails in June 2018, Famularo believed he was corresponding directly with MGU via the "ecommerce" email address and was unaware that Rivelle was using that email address to communicate on behalf of MGU.

verifying purchases directly from MGU, the listings were restored. (*Id.* ¶ 68.) On August 3, 2018, R&F sent a letter to Amazon criticizing the takedowns as premised on "baseless counterfeit complaints" and explaining that Plaintiff sold products sourced directly from MGU. (*Id.* ¶ 73; Dkt. 7-17, at ECF 1–3.) MGU continued to make false counterfeiting complaints against Plaintiff, including on August 10 and 18, September 27, and October 2, 2018. (SAC, Dkt. 30, ¶ 74.)

On August 23, 2018, Famularo sent a letter to MGU's "ecommerce" email address

█████████████████████████████████████████████████████

██████████████████████ (Dkt. 67, at ECF 32–33.) Specifically, Famularo solicited an agreement whereby ██████████████████████████████████████████████

█████████████████████████████████████████████████████

███████████████████████ (*Id.*) Famularo reiterated that the counterfeit complaints against Plaintiff were baseless because Plaintiff had sourced its F&W products directly from MGU, and threatened that MGU could face civil or criminal penalties ███████████████

█████████████████████████████████████████████████████

███████████████████ (*Id.*)

On August 27, 2018, Frailly, writing from "tim.frailly@rivellepro.com" and copying the "ecommerce" email address, emailed CJ Rosenbaum, another R&F attorney, and Famularo in response to Famularo's August 23 solicitation letter, explaining ████████████████

█████████████████████████████████████████████████████

█████████████████████████████████████████████████████

████ (Dkt. 67, at ECF 35; *see also* Dkt. 59.) The next day, Famularo responded that ████

████████████████████████████████████████████ (Dkt.

67, at ECF 2.)  Frailly and R&F exchanged a total of five emails.[14]  (Dkt. 63-1, at ECF 32.)

By October 2, 2018, MGU had initiated a total of 41 false IP complaints against Plaintiff. (SAC, Dkt. 30, ¶¶ 71, 74–75.)  On October 18, 2018, Amazon suspended Plaintiff's selling privileges based on five unresolved counterfeit complaints.  (*Id.* ¶ 79; Dkt. 63-1, at ECF 20.) Amazon explained that Plaintiff could "reactivate" its seller account by submitting a "valid plan of action," including, *inter alia*, proof of authenticity for infringing listings (*i.e.*, invoice or Order ID) or information about why the complaints are incorrect.  (Dkt. 63-1, at ECF 20.)  However, Plaintiff alleges it "had no alternative, in mitigation of its damages, but to hire a consultant for $5,500 and thereafter agree to cease its sales of F&W products on Amazon in exchange for MGU's retraction of IP [c]omplaints and concomitant account restatement."  (SAC, Dkt. 30, ¶ 80.)  On October 22, 2018, the parties entered into such an agreement, which did not impact Plaintiff's ability to sell F&W products on outlets other than Amazon.  (*Id.* ¶ 81; Dkt. 7-16, at ECF 1–2.) Plaintiff was reinstated as an Amazon seller on November 6, 2018.  (SAC, Dkt. 30, ¶¶ 50, 112.)

*     *     *

In sum, Plaintiff alleges that MGU's complaints against it were, "purely and simply, a matter of eliminating competition on the Amazon Platform," and that any justification—whether "lack of manufacturer's warranty (which Amazon would not recognize as a valid distinction) [or] counterfeit (which Amazon is quick to sanction)"—"were and are purely pretextual."  (*Id.* ¶ 82.)

---

[14] The Court notes that only two of the five emails (Frailly's August 27 response and Famularo's August 28 reply) were produced as part of jurisdictional discovery; the remaining three emails were withheld by Defendant Rivelle as privileged attorney-client communication between Frailly and R&F.  (*See* Dkt. 63-1, at ECF 31–32 (privilege log reflecting five emails).)  The Court further notes that Plaintiff does not explain what happened after Frailly exchanged these emails with R&F, including, for example, whether Plaintiff terminated its attorney-client relationship with R&F or attempted to convey the solicitation to MGU on its own behalf.

Plaintiff further alleges that consumers have been harmed by its exclusion as a third-party seller of F&W products on Amazon because, without competition from "unauthorized" sellers, the price of F&W products on Amazon has "stabilized at artificially high, i.e., anticompetitive levels" and the availability of F&W products has been limited.  (*Id.* ¶¶ 83, 84.)

## II.    Procedural History

On February 10, 2020, Plaintiff commenced this action against Defendant MGU by filing a complaint, which was amended on February 19, 2020, to add Defendants Rivelle and Frailly.[15] (*See* Complaint, Dkt. 1; Amended Complaint, Dkt. 6.)  The Amended Complaint alleges antitrust violations of the Sherman Act and violations of New York law for tortious interference with existing and prospective economic relations and for libel *per se*.  (*See generally* Amended Complaint, Dkt. 6.)  On May 4, 2020, Defendants Rivelle, Frailly, and MGU requested a conference in advance of filing motions to dismiss.  (Dkts. 22, 23.)  On May 6, 2020, Plaintiff responded and attached limited jurisdictional discovery requests aimed at Defendants MGU and Rivelle.  (Dkts. 24, 24-1, 25, 25-1.)  The Court scheduled a conference "to discuss the personal jurisdiction aspects of Defendants' proposed motions to dismiss and whether limited discovery on that issue is necessary prior to briefing."  (5/6/2020 Docket Order.)

On June 4, 2020, the Court held a conference, during which it ordered Plaintiff to file a second amended complaint by June 18, 2020 that, *inter alia*, alleged more facts to establish jurisdiction.[16]  (6/4/2020 Minute Entry; June 4, 2020 Conference Transcript ("6/4/2020 Tr."), Dkt.

---

[15] The Complaint and Amended Complaint also named Kameal and Vickram Narain as defendants.  On February 20, 2020, after filing the amended complaint, Plaintiff voluntarily dismissed the Narains without prejudice (Notice of Voluntary Dismissal, Dkt. 8), and they were terminated as parties (2/20/2020 Docket Order).

[16] During the June 4, 2020 conference, the Court asked Plaintiff's counsel why the case was brought in New York and he responded: "[i]t happens I'm barred in New York and these events happened in New York, so I brought the case in New York rather than telling the client that

70, at 37:8–13.)  During the conference, Plaintiff's counsel confirmed that the "lynchpin" for the personal jurisdiction argument was the negotiations with R&F.  (6/4/2020 Tr., Dkt. 70, at 9:12–11:8.)  The Court determined that limited jurisdictional discovery was warranted and directed Defendants to respond to Plaintiff's discovery requests by June 19, 2020.  (6/4/2020 Minute Entry.)

On June 17, 2020, Plaintiff filed the SAC with exhibits against Defendants MGU, Rivelle, and Frailly, alleging violations of the Sherman Act and New York law for tortious interference with existing and prospective economic relations.[17]  (*See generally* SAC, Dkt. 30.)  Thereafter the parties engaged in extensive and repetitive motion practice regarding jurisdictional discovery (*see* Dkts. 31–45), for which they were admonished by the Honorable Sanket J. Bulsara, Magistrate Judge (*see* 7/10/2020 Docket Order).  On July 21, 2020, the parties stipulated, *inter alia*, that Defendant Rivelle would not contest the Court's personal jurisdiction for purposes of this matter, but that Defendant Frailly retained all rights to contest personal jurisdiction over him.  (Stipulation ("Stip."), Dkt. 46.)  On July 22 and 23, 2020, Plaintiff moved to compel Defendant Rivelle's and

---

he couldn't bring the case at all, except if he paid hourly."  (6/4/2020 Tr., Dkt. 70, at 12:14–13:10.)  As the Court explains in this opinion, Plaintiff has failed to adequately allege that the events at issue in this case happened in New York or that they have a connection with New York sufficient to confer personal jurisdiction over Defendants.  In light of Plaintiff's counsel's testimony on June 4, the Court is inclined to see his selection of venue more as a reflection of personal convenience than as having a basis in law.  In fact, in its opposition, Plaintiff concedes that "this action could have been commenced in the Southern District of Florida, Central District of California, District of Delaware, or Western Washington."  (Plaintiff's Omnibus Brief in Opposition to the Motions to Dismiss ("Pl.'s Opp'n."), Dkt. 63, at 42.)  Plaintiff's counsel would have been well-served to consider, in the first instance, whether any of those venues were more appropriate than the Eastern District of New York rather than inviting costly and time-consuming motion practice and discovery at the outset of the case.

[17] Although the SAC states that "Plaintiff also sues in . . . defamation under the common law" (SAC, Dkt. 30, ¶ 11), the Court assumes this is in error as Plaintiff's counsel withdrew the defamation claim on the record during the June 4, 2020 conference, after conceding that the claim was barred by the one-year statute of limitations (6/4/2020 Tr., Dkt. 70, at 36:19–37:5), and Plaintiff does not allege facts in support of such a claim in the SAC.

MGU's responses to certain discovery requests. (*See* Dkts. 47, 49.) Judge Bulsara denied both motions, finding Plaintiff's request for "all documents concerning" MGU's "transaction of business in New York state, including contracts or purchases with entities located in New York" to be "overbroad and disproportional" to Plaintiff's theory of specific personal jurisdiction over MGU, *Tymar Distrib. LLC v. Mitchell Grp. USA, LLC*, No. 20-CV-719 (PKC) (SJB), 2020 WL 8408809, at *1–3 (E.D.N.Y. Sept. 8, 2020), and that Rivelle's waiver of any challenge to personal jurisdiction meant it was not required to provide jurisdictional discovery, *see id.* at *3.

On August 18, 2020, Defendant MGU moved to dismiss based on lack of personal jurisdiction, improper venue, and failure to state a claim, pursuant to Federal Rule of Civil Procedure ("Rule") 12(b)(2), Rule 12(b)(3), and Rule 12(b)(6) respectively. (*See generally* MGU's Motion, Dkt. 52.) On August 19, 2020, Defendants Rivelle and Frailly jointly moved to dismiss on the same grounds as MGU, though Defendant Rivelle did not move to dismiss for lack of personal jurisdiction. (*See generally* Memorandum of Law ("Rivelle and Frailly's Mem."), Dkt. 54.) On September 11, 2020, Plaintiff filed an omnibus opposition to Defendants' motions to dismiss. (Pl.'s Opp'n., Dkt. 63.) On October 5, 2020, Defendants filed reply briefs. (Reply Memorandum of Law ("Rivelle and Frailly's Reply"), Dkt. 68; Defendant MGU's Memorandum of Law, Dkt. 69.) Thereafter, Plaintiff provided the Court with supplemental authority, to which Defendants Rivelle and Frailly responded. (*See* Dkts. 71, 72, 73.)

## LEGAL STANDARDS

### I.     Rule 12(b)(2)

Plaintiff "bears the burden of demonstrating personal jurisdiction over a person or entity against whom it seeks to bring suit." *Troma Entm't, Inc. v. Centennial Pictures Inc.*, 729 F.3d 215, 217 (2d Cir. 2013) (citation omitted). The showing a plaintiff must make to defeat a motion to dismiss based on lack of personal jurisdiction operates on a "sliding scale" that depends on the

procedural posture of the case. *Dorchester Fin. Sec., Inc. v. Banco BRJ, S.A.*, 722 F.3d 81, 84 (2d Cir. 2013) (per curiam). Prior to discovery, "the plaintiff's *prima facie* showing may be established solely by allegations." *Id.* at 85 (quoting *Ball v. Metallurgie Hoboken-Overpelt, S.A.*, 902 F.2d 194, 197 (2d Cir. 1990)). After discovery, however, "the plaintiff's *prima facie* showing . . . must include an averment of facts that, if credited by the trier [of fact], would suffice to establish jurisdiction over the defendant." *Id.* (quoting *Ball*, 902 F.2d at 197). In other words, "the *prima facie* showing must be factually supported." *Id.* (quoting *Ball*, 902 F.2d at 197); *see Chloe v. Queen Bee of Beverly Hills, LLC*, 616 F.3d 158, 163 (2d Cir. 2010).

In evaluating whether a *prima facie* showing of personal jurisdiction has been made, the court must "construe the pleadings and affidavits in the light most favorable to plaintiffs, resolving all doubts in their favor." *Chloe*, 616 F.3d at 163; *accord Yih v. Taiwan Semiconductor Mfg. Co.*, 815 F. App'x 571, 572–73 (2d Cir. 2020) (summary order); *Mednik v. Specialized Loan Servicing, LLC*, No. 20-CV-427 (MKB), 2021 WL 707285, at *3 (E.D.N.Y. Feb. 23, 2021). However, courts need not "resolve 'argumentative inferences in the plaintiff's favor' or 'accept as true a legal conclusion couched as a factual allegation.'" *Lifeguard Licensing Corp. v. Ann Arbor T-Shirt Co., LLC*, No. 15-CV-8459 (LGS), 2016 WL 3748480, at *2 (S.D.N.Y. July 8, 2016) (quoting *In re Terrorist Attacks on Sept. 11, 2001*, 714 F.3d 659, 673 (2d Cir. 2013)).

## II.     Rule 12(b)(3)

When faced with a Rule 12(b)(3) motion to dismiss for improper venue, a court applies the same standard it would to a motion to dismiss under Rule 12(b)(2). *Gulf Ins. Co. v. Glasbrenner*, 417 F.3d 353, 355 (2d Cir. 2005). "If the court chooses to rely on pleadings and affidavits, the plaintiff need only make a *prima facie* showing of [venue]." *Id.* at 355 (quoting *CutCo Indus., Inc. v. Naughton*, 806 F.2d 361, 364 (2d Cir. 1986)); *see also Orly Indus., Inc. v. Rite Aid Hdqtrs. Corp.*, No. 12-CV-855 (SLT) (JMA), 2013 WL 4516101, at *3 (E.D.N.Y. Aug. 23, 2013) ("Rule

12(b)(3) allows a court considering a venue challenge to 'consider evidence outside the four corners of the complaint, including affidavits and other documentary evidence.'" (citation omitted)). "In analyzing whether the plaintiff has made the requisite prima facie showing that venue is proper, [courts] view all the facts in a light most favorable to plaintiff." *Phillips v. Audio Active Ltd.*, 494 F.3d 378, 384 (2d Cir. 2007).

### III.     Rule 12(b)(6)

To survive a motion to dismiss pursuant to Rule 12(b)(6), "a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)). "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Id.* (citing *Twombly*, 550 U.S. at 556). "The plausibility standard is not akin to a 'probability requirement,' but it asks for more than a sheer possibility that a defendant has acted unlawfully." *Id.* (quoting *Twombly*, 550 U.S. at 556). Determining whether a complaint states a plausible claim for relief is "a context-specific task that requires the reviewing court to draw on its judicial experience and common sense." *Id.* at 679 (citation omitted). "In addressing the sufficiency of a complaint[,] [the Court] accept[s] as true all factual allegations and draw[s] from them all reasonable inferences; but [the Court is] not required to credit conclusory allegations or legal conclusions couched as factual allegations." *Rothstein v. UBS AG*, 708 F.3d 82, 94 (2d Cir. 2013).

### DISCUSSION

A Court facing a challenge to both its jurisdiction over a defendant and the sufficiency of any claim must first address the jurisdictional questions. "[L]ogic compel[s] initial consideration of the issue of jurisdiction over the defendant—a court without such jurisdiction lacks power to

dismiss a complaint for failure to state a claim." *Arrowsmith v. United Press Int'l*, 320 F.2d 219, 221 (2d Cir. 1963); *see also id.* at 234 (vacating judgment dismissing the complaint for failure to state a claim and remanding for consideration of personal jurisdiction and venue before consideration of the merits); *Lugones v. Pete & Gerry's Organic, LLC*, 440 F. Supp. 3d 226, 234 (S.D.N.Y. 2020) (citing *Arrowsmith* and finding that it must first address the defendants' motion to dismiss for lack of personal jurisdiction before reaching the motion to dismiss for failure to state a claim). Therefore, the Court will first address whether Plaintiff has made a *prima facie* showing of personal jurisdiction over Defendants Frailly and MGU before moving to the sufficiency of Plaintiff's federal antitrust and state-law claims.

## I.     The Court Does Not Have Personal Jurisdiction Over Defendant Frailly

### A.     Section 12 of the Clayton Act

To the extent Plaintiff claims that the Court has personal jurisdiction over Defendant Frailly under the Clayton Act, that argument fails. Section 12 of the Clayton Act states

> [a]ny suit, action, or proceeding under the antitrust laws against *a corporation* may be brought not only in the judicial district whereof it is an inhabitant, but also in any district wherein it may be found or transacts business; and all process in such cases may be served in the district of which it is an inhabitant, or wherever it may be found.

15 U.S.C. § 22 (emphasis added). This provision applies to corporations, and has been narrowly construed to "exclude[] individuals." *Kingsepp v. Wesleyan Univ.*, 763 F. Supp. 22, 25 (S.D.N.Y. 1991) (quoting *McManus v. Tato*, 184 F. Supp. 958, 959 (S.D.N.Y. 1959)). Thus, even if the Clayton Act provided jurisdiction over a corporate defendant, "the court must [still] look to the long-arm statute of the state where it sits in order to reach an individual defendant in an antitrust suit where he is transacting business. *Daniel v. Am. Bd. of Emergency Med.* (*Daniel I*), 802 F. Supp. 912, 919 (W.D.N.Y. 1992). The Court does not have jurisdiction over Defendant Frailly

pursuant to the Clayton Act and therefore turns to Plaintiff's arguments under New York's long-arm statute.

### B.     New York Civil Practice Law and Rules Section 302(a)(1)

"A district court's personal jurisdiction is determined by the law of the state in which the court is located." *Licci ex rel. Licci v. Lebanese Canadian Bank, SAL* (*Licci I*), 673 F.3d 50, 59–60 (2d Cir. 2012) (quoting *Spiegel v. Schulmann*, 604 F.3d 72, 76 (2d Cir. 2010)).  There are two types of personal jurisdiction—(1) general jurisdiction, which may be asserted over a defendant "when their affiliations with the State are so 'continuous and systematic' as to render them essentially at home in the forum State," and (2) specific jurisdiction, which "depends on an 'affiliatio[n] between the forum and the underlying controversy,' principally, activity or an occurrence that takes place in the forum State and is therefore subject to the State's regulation." *Goodyear Dunlop Tires Operations, S.A. v. Brown*, 564 U.S. 915, 919 (2011) (citations omitted); *accord Waldman v. Palestine Liberation Org.*, 835 F.3d 317, 331 (2d Cir. 2016).  In New York, Sections 301 and 302 of the state's Civil Practice Law and Rules ("CPLR") provide the authority for the Court's exercise of general and specific personal jurisdiction, respectively.  *See Licci I*, 673 F.3d at 60 n.9; *Mednik*, 2021 WL 707285, at *3.

Plaintiff alleges that the Court has specific personal jurisdiction over Defendant Frailly[18] under CPLR § 302(a)(1) ("Section 302(a)(1)") based on Frailly's communications with New York-based R&F.  (SAC, Dkt. 30, ¶¶ 15, 20–21.)  These communications amount to a total of five emails

---

[18] Plaintiff does not assert general personal jurisdiction over Defendant Frailly, who is a resident and domiciliary of California; does not own property, maintain a bank account, file taxes, maintain an office, employ individuals, or solicit business with "any degree of regularity" in New York; conducts the "vast majority" of his business from his office in California; and has only traveled to New York twice in his life and only for brief leisure vacations.  (*See* Declaration of Timothy Michael Frailly ("Frailly Decl."), Dkt. 55.)

exchanged between Frailly and R&F in which Frailly allegedly "reject[ed]" Plaintiff's offer to serve as MGU's brand protector "in furtherance of" and "in deference to" the alleged conspiracy between Rivelle and MGU to eliminate competition and preserve supra-competitive pricing of F&W products on Amazon.[19]  (*Id.* ¶ 21; *see* Pl.'s Opp'n., Dkt. 63, at 34–35.)  Plaintiff's personal jurisdiction argument is complicated by the unique fact that R&F served as counsel to *both* Plaintiff and Defendant Rivelle.  In that sense, the at-issue communications at once constitute a response to a solicitation conveyed by Plaintiff's counsel, and, at the same time, an attorney-client communication addressing a potential conflict of interest from a client protecting its own business interest.  The Court views these contacts through both lenses and concludes that it does not have personal jurisdiction over Defendant Frailly.

Section 302(a)(1) "authorizes jurisdiction over defendants if: 1) the defendants transact business in New York; and 2) the cause of action arises from that transaction of business."  *Reich v. Lopez* ("*Reich I*"), 858 F.3d 55, 63 (2d Cir. 2017).  The defendant need not be physically present in New York to "transact business" here, "as long as he engages in '[p]urposeful activities' or 'volitional acts' through which he 'avails [him]self of the privilege of conducting activities within the . . . State, thus invoking the benefits and protections of its laws.'"  *Chloe*, 616 F.3d at 169 (quoting *Fischbarg v. Doucet*, 880 N.E.2d 22, 26 (N.Y. 2007)).  Further, "proof of one transaction in New York is sufficient to invoke jurisdiction, . . . so long as the defendant's activities here were purposeful and there is a substantial relationship between the transaction and the claim asserted."

---

[19] Plaintiff also alleges that Defendant Frailly had "telephonic discussion[s]" with R&F in "deference to the conspiracy" (SAC, Dkt. 30, ¶ 21), but alleges no specific facts to support the occurrence of such discussions.  *See Dorchester Fin. Sec.*, 722 F.3d at 85.  Even assuming, *arguendo*, Plaintiff alleged facts regarding such phone discussions, it would not change the Court's conclusion that Frailly's contacts with R&F are insufficient to confer the Court's personal jurisdiction over him in this matter.

*Id.* (quoting *Kreutter v. McFadden Oil Corp.*, 522 N.E.2d 40, 43 (N.Y. 1988)). Ultimately, the analysis is not focused on "the quantity but the quality of the contacts," *Paterno v. Laser Spine Inst.*, 23 N.E.3d 988, 994 (N.Y. 2014); *accord Rosenblatt v. Coutts & Co. AG*, 750 F. App'x 7, 10 (2d Cir. 2018) (summary order); *Mason v. Antioch Univ.*, No. 15-CV-5841 (SJF) (GRB), 2016 WL 2636257, at *7 (E.D.N.Y. May 5, 2016), and "necessarily requires examination of the particular facts in each case," *Licci v. Lebanese Canadian Bank* (*Licci II*), 984 N.E.2d 893, 899 (N.Y. 2012).

When viewing Frailly's email contacts with R&F as a response to a solicitation offer from Plaintiff's counsel, the Court is not convinced that Frailly has "transacted business" in New York within the meaning of Section 302(a)(1). Although New York courts have held that jurisdiction may extend to actors using "electronic and telephonic means to project themselves into New York," such jurisdiction extends when the actor "*seeks out and initiates* contact with New York, *solicits* business in New York, and *establishes* a continuing relationship." *Paterno*, 23 N.E.3d at 993 (emphases added); *see Fischbarg*, 880 N.E.2d at 28 ("[J]urisdiction may [] be proper if the defendant on his or her own initiative projects himself or herself into this state to engage in a sustained and substantial transaction of business." (alterations, quotations, and citation omitted)). Here, Frailly's email contacts with New York were essentially "responsive in nature, and not the type of interactions that demonstrate the purposeful availment necessary to confer personal jurisdiction over [an] out-of-state defendant[]." *See Paterno*, 23 N.E.3d at 994 (holding that the Florida-based defendant whom the New York-based plaintiff "initially sought out" was not subject to personal jurisdiction because it "responded with information" to the plaintiff's inquiry and spoke with the plaintiff's New York-based doctor).

On August 23, 2018, New York-based R&F sent a letter to the "ecommerce" email address

███████████████████████████████████████████████████████████████████████

████████████████████ (Dkt. 67, at ECF 32–33.)  On August 27, 2018, Defendant Frailly

responded from his Rivelle email address ███████████████████████████████

██████████████████████████ (*Id.* at ECF 35.)  The next day, August 28,

2018, R&F replied that ██████████████████████████████████████████████

████████ (*Id.* at ECF 2.)  Jurisdictional discovery revealed that following Frailly's August 27

response and R&F's August 28 reply, three more emails were exchanged regarding the same

topic.[20]  (Dkt. 63-1, at ECF 32.)  Even construing these communications in a light most favorable

to Plaintiff, it is clear that Frailly was neither "seek[ing] out" nor "initiat[ing] contact with New

York," *Paterno*, 23 N.E.3d at 993, but was responding to a communication that happened to

originate in New York.  Such responsive contacts do not, in themselves, constitute the transaction

of business, and thus do not confer jurisdiction under Section 302(a)(1).  *See Gazzillo v. Ply Gem

Indus., Inc.*, No. 17-CV-1077 (MAD) (CFH), 2018 WL 5253050, at *5 (N.D.N.Y. Oct. 22, 2018)

---

[20] Although the three additional emails were not produced during jurisdictional discovery, the privilege log produced by Rivelle describes those emails as "[a]ttorney-client communications" responding to Frailly's August 27, 2018 email, which was sent "for the purposes of preventing conflicts of interest that would damage the attorney-client relationship, and seeking advice re: services offered by the law firm."  (Dkt. 63-1, at ECF 32.)  The Court assumes that the reference to "services offered by the law firm" refers to ███████████████████████████████

███████████████████████████████████████████ (*See* Dkt. 59, at ECF 2.)  The Court's assumption is further supported by Famularo's August 28, 2018 response that ████████

██████████████████████████████████████████████████████████████████ (Dkt. 67, at ECF 2.)  The privilege log indicates that conversations between Frailly and R&F continued on that front.  (*See* Dkt. 63-1, at ECF 32.)  Thus, the Court rejects Plaintiff's contention that the five emails referenced in the privilege log "directly relat[e] to the matter at suit," or, for the reasons explained herein, that they have a sufficient nexus to Plaintiff's claims to confer jurisdiction over Defendant Frailly.  (*See* Pl.'s Opp'n., Dkt. 63, at 28–29.)

(finding that the defendants "did not purposefully avail themselves of New York when they sent reply letters to [two] New York residents that merely [denied] warranty claims"); *Mason*, 2016 WL 2636257, at *8 (finding that the defendant was not subject to jurisdiction in New York based only on responses to inquiries from the New York-based plaintiffs). By responding to a solicitation that was sent from New York (but that could have been sent from anywhere Plaintiff's counsel was located), Frailly can hardly be seen as "project[ing] himself" into New York "on his [] own initiative." *Cf. Fischbarg*, 880 N.E.2d at 26–28 (finding that it was proper to exercise jurisdiction over the defendant who "sought out plaintiff in New York" by calling him, "and established an ongoing attorney-client relationship with [plaintiff]" by, *inter alia*, "project[ing]" numerous "calls, faxes and e-mails" into New York "over many months"). Even when construing the pleadings in the light most favorable to Plaintiff, and viewing Frailly as inserting himself into, and thereby obstructing, Plaintiff's solicitation, the Court still does not find that Frailly was "invoking the benefits and protections" of New York law, *see Chloe*, 616 F.3d at 169 (quoting *Fischbarg*, 880 N.E.2d at 26), simply by asserting Rivelle's role as MGU's "exclusive distributor" and raising the conflict of interest posed by R&F's simultaneous representation of Plaintiff and Rivelle. Moreover, even if these communications satisfied the transacting-business prong of the analysis, they do not bear a sufficient nexus to Plaintiff's claims to confer jurisdiction, in that the communications related to Plaintiff's solicitation of a joint venture with MGU, and not the allegedly false IP complaints submitted by MGU to Amazon.[21]

---

[21] The Court notes that although Famularo's August 28, 2018 email to Frailly mentions generally that ███████████████████████████████████████████████████████████ ████████████████████████████████████████████████████████████ █████████ this does not affect the Court's finding that Defendant Frailly did not project himself into New York in connection with the IP complaints against Plaintiff. (*See* Dkt. 67, at ECF 2.)

Although Section 302(a)(1) does not require causation between the alleged unlawful conduct and the defendant's contacts with New York, the plaintiff's legal claims must not be "completely unmoored" from the defendant's transaction of business in the state, such that the relationship between the two is "merely coincidental." *Licci II*, 984 N.E.2d at 900–01. Generally, "where claims have been dismissed on jurisdictional grounds for lack of a sufficient nexus . . . , the injuries sustained and the resulting disputes [will bear] such an attenuated connection to the New York activity upon which the plaintiffs attempt[] to premise jurisdiction that the disputes [cannot] be characterized as having 'arisen from' the New York activity." *Sole Resort, S.A. de C.V. v. Allure Resorts Mgmt., LLC*, 450 F.3d 100, 104 (2d Cir. 2006) (collecting cases); *see, e.g.*, *Johnson v. Ward*, 829 N.E.2d 1201, 1203 (N.Y. 2005) ("Plaintiffs' cause of action arose out of defendant's allegedly negligent driving in New Jersey, not from the issuance of a New York driver's license or vehicle registration."); *Beacon Enters., Inc. v. Menzies*, 715 F.2d 757, 765 (2d Cir. 1983) ("[Defendant's] shipments of goods into New York are irrelevant to [plaintiff']s declaratory judgment action[, which] would exist regardless of whether [defendant's] products were sent to New York.").

If "at least one element [of the claim] arises from the New York contacts," then "the relationship between the business transaction and the claim asserted supports specific jurisdiction." *Licci II*, 984 N.E.2d at 901; *accord Licci ex rel. Licci v. Lebanese Canadian Bank, SAL* (*Licci III*), 732 F.3d 161, 168–69 (2d Cir. 2013). Here, none of the elements of Plaintiff's claims arise from or are sufficiently related to Frailly's email communications with R&F in response to a proposed joint venture. First, Plaintiff's claims alleging Sherman Act violations require proof that (1) the challenged conduct stems "from an agreement, tacit or express," and (2) that the agreement or "common scheme . . . constituted an unreasonable restraint of trade." *United States v. Apple, Inc.*,

791 F.3d 290, 314–315, 320–21 (2d Cir. 2015). Plaintiff alleges that Frailly's email communications with R&F were "in furtherance of" and "deference to" the alleged anticompetitive conspiracy to eliminate price competition (*see* SAC, Dkt. 30, ¶¶ 15, 20–21); however, it strains credulity to see more than an attenuated connection between these communications and Amazon's independent decision to suspend Plaintiff's selling privileges more than a month later. Moreover, these communications have nothing to do with whether the alleged restraint on trade, *i.e.*, the elimination of price competition for F&W products, was, in fact, unreasonable. Second, Plaintiff's claim alleging tortious interference requires proof that "(1) the plaintiff had business relations with a third party; (2) the defendant interfered with those business relations; (3) the defendant acted for a wrongful purpose or used dishonest, unfair, or improper means; and (4) the defendant's acts injured the relationship." *Catskill Dev., L.L.C. v. Park Place Entm't Corp.*, 547 F.3d 115, 132 (2d Cir. 2008). Frailly's limited communications with R&F about a proposed joint venture are "unmoored" from all elements of this claim, which is rooted in Defendants' alleged interference with Plaintiff's relationship *with Amazon* through allegedly false IP complaints made *to Amazon*. In sum, the Court finds that Plaintiffs' antitrust and tortious interference claims would exist *regardless* of whether Frailly communicated with New York-based R&F, *see Beacon Enters., Inc.*, 715 F.2d at 765, further confirming the Court's conclusion that it does not have jurisdiction over Defendant Frailly based on these communications.

Even when viewing Defendant Frailly's communications with R&F through the lens of an attorney-client relationship, and not simply as responsive to a solicitation by Plaintiff, the Court still cannot find that Section 302(a)(1) is satisfied, though for a different reason. "While the retention of New York lawyers tasked with the advancement of [d]efendants' interests qualifies as transacting business pursuant to § 302(a)(1)," *Reich v. Lopez* ("*Reich II*"), 38 F. Supp. 3d 436, 458

(S.D.N.Y. 2014) (citing *PDK Labs, Inc. v. Friedlander*, 103 F.3d 1105, 1109 (2d Cir. 1997)), *aff'd*, 858 F.3d 55 (2d Cir. 2017), jurisdiction does not lie where those lawyers did not participate in the conduct that gives rise plaintiff's claims, *see id.* Two cases are instructive on this point.[22] In *Reich II*, the plaintiff alleged that the defendants transacted business in New York by "hiring [] and consulting" with New York counsel on defamation lawsuits, to which the plaintiff was not a party, thereby involving New York counsel in their "multi-pronged strategy" to conceal an alleged illegal scheme. 38 F. Supp. 3d at 458. The court held that it did not have personal jurisdiction over defendants, noting the absence of any allegation that New York counsel "participated in or provided advice regarding the two alleged phone calls giving rise to the current claims," and concluding that "New York counsel was retained by Defendants, who *separately and independently* caused harm to Plaintiffs." *Id.* (emphasis added). By contrast, in *PDK Labs, Inc. v. Friedlander*, the Second Circuit affirmed jurisdiction over a defendant who retained New York counsel that frequently contacted the plaintiff by phone and letter, threatened legal action, attempted settlement of alleged claims, and solicited the plaintiff's investment in defendant's product. 103 F.3d at 1109. The Circuit held that the "persistent campaign by [the defendant]'s New York [attorney] agent . . . constitutes business transacted in New York" and that the plaintiff's declaratory judgment action "arises from" the defendant's "strategy of intertwining legal threats with solicitation of investments in his product." *Id.* at 1109–10.

---

[22] The Court finds Plaintiff's reliance on *Tilyou v. Carroll*, 92-CV-750 (CPS), 1993 U.S. Dist. LEXIS 3217 (E.D.N.Y. Mar. 15, 1993) (*see* Pl.'s Opp'n., Dkt. 63, at 25, 27–29) inapposite as the facts of that case are entirely distinguishable from the facts here. *Tilyou* involved a non-domiciliary attorney who solicited the New York-based plaintiff as a client, established an ongoing attorney-client relationship with the plaintiff, and then conducted activities in New York that gave rise to the plaintiff's legal malpractice claim. *Tilyou*, 1993 U.S. Dist. LEXIS 3217, at *2–4, *17–18.

Here, the jurisdictional facts alleged by Plaintiff are far more analogous to those in *Reich II* than *PDK Labs, Inc.* Frailly's coordination with R&F was not a "persistent campaign" aimed at Plaintiff that gave rise to Plaintiff's Sherman Act and state law claims. *See PDK Labs, Inc.*, 103 F.3d at 1109. Plaintiff does not allege that R&F was involved in any negotiations between Rivelle and MGU to form the alleged anticompetitive conspiracy, or that R&F made IP complaints to Amazon on behalf of Defendants, or that Defendants directed R&F to contact or interact with Plaintiff.[23] In fact, Plaintiff's contacts with R&F are the result of *Plaintiff* retaining the firm as counsel. Any contention by Plaintiff that Frailly's attorney-client coordination with R&F bears a sufficient nexus with Plaintiff's claims is akin to the plaintiff's unsuccessful contention in *Reich II* that New York counsel's involvement in a "multi-pronged" strategy offered a sufficient nexus to confer jurisdiction. *See* 38 F. Supp. 3d at 458. It does not. The pleadings, even when construed in a light most favorable to Plaintiff, plainly allege that Rivelle and MGU, "separately and independently" of R&F, harmed Plaintiff by allegedly conspiring to eliminate price competition. *See id.* In sum, Plaintiff has failed to make a *prima facie* showing of personal jurisdiction over Defendant Frailly under Section 302(a)(1).

*     *     *

---

[23] Plaintiff argues in its opposition that it sought, unsuccessfully, to obtain discovery that would reveal "whether R&F created or 'blessed' the language used by [Rivelle] to actuate Amazon's de-listing and suspension of [Plaintiff] from the platform," which would "place key facets of the conspiracy's success in this District" and show "an 'articulable nexus' to New York." (Pl.'s Opp'n., Dkt. 63, at 26–27.) For the reasons started herein, the Court is skeptical that such discovery would, in fact, satisfy the requirements of Section 302(a)(1) as R&F's alleged and demonstrated involvement is tangential to Plaintiff's causes of action. In any event, the mere prospect that Plaintiff might uncover evidence to support its claims during discovery does not cure an otherwise inadequate pleading. *See Iqbal*, 556 U.S. at 678–79 ("Rule 8 . . . does not unlock the doors of discovery for a plaintiff armed with nothing more than conclusions.").

Finally, the Court rejects Plaintiff's argument that personal jurisdiction should be imputed to Defendant Frailly by virtue of Defendant Rivelle's stipulation to personal jurisdiction. (*See* Pl.'s Opp'n., Dkt. 63, at 30–31.) The stipulation *expressly states* that Defendant Frailly "retains all rights to contest this court's personal jurisdiction over [him] in his individual capacity" (Stip., Dkt. 46, ¶ 3), and Plaintiff has provided neither persuasive authority nor a compelling reason why this reservation of rights should not be honored.[24] The Court also rejects Plaintiff's argument that Defendant Frailly is subject to personal jurisdiction as a co-conspirator with Rivelle and MGU. (Pl.'s Opp'n., Dkt. 63, at 25–26, 36–37.) To allege a conspiracy theory of jurisdiction, Plaintiff must allege that "(1) a conspiracy existed; (2) the defendant participated in the conspiracy; and (3) a co-conspirator's overt acts in furtherance of the conspiracy had sufficient contacts with a state to subject that co-conspirator to jurisdiction in that state." *In re SSA Bonds Antitrust Litig.*, 420 F. Supp. 3d 219, 236 (S.D.N.Y. 2019) (quoting *Charles Schwab Corp. v. Bank of Am. Corp.*, 883 F.3d 68, 87 (2d Cir. 2018)). Curiously, and circularly, the contacts Plaintiff relies upon to allege conspiracy jurisdiction vis-à-vis Frailly are Frailly's *own* contacts with New York. (Pl.'s Opp'n., Dkt. 63, at 36–37.) While this may amount to an argument for conspiracy jurisdiction over alleged co-conspirators Rivelle and MGU, it does not constitute an argument for conspiracy jurisdiction over Defendant Frailly himself, and as already discussed, Frailly's alleged contacts

---

[24] The Court is not convinced by Plaintiff's argument that it would be "unfair to allow [Rivelle] to concede personal jurisdiction of itself, shield relevant discovery as to Mr. Frailly (and MGU), the immediate actor in the events at suit, and allow Frailly to avoid agency jurisdiction." (Pl.'s Opp'n., Dkt. 63, at 31.) The so-called "relevant discovery" that Plaintiff moved to compel from Rivelle, and that Judge Bulsara denied, included "[d]ocuments sufficient to disclose any standard verbiage used by defendant in reporting as counterfeit the listings or products listed by third party sellers on Amazon" and "[c]ontracts and agreements between" Rivelle and MGU. *Tymar Distrib. LLC*, 2020 WL 8408809, at *3. Plaintiff fails to explain how such discovery would strengthen its allegation that the Court has personal jurisdiction over Defendant Frailly, or how Plaintiff is unfairly prejudiced in meeting its burden regarding personal jurisdiction without such discovery.

with New York are insufficient under New York law to confer personal jurisdiction over him in New York.[25]

For all of these reasons, Defendant Frailly's motion to dismiss based on lack of personal jurisdiction is granted, and he is dismissed from this case.

## II. The Court Does Not Have Personal Jurisdiction Over Defendant MGU

### A. Section 12 of the Clayton Act

Plaintiff claims that the Court has personal jurisdiction over Defendant MGU under the Clayton Act because MGU "conducted suit-related activities within this District." (SAC, Dkt. 30, ¶ 20.) Specifically, Plaintiff alleges that "MGU had substantive discussions and negotiations" with R&F related to Plaintiff's ability to sell F&W products on Amazon and to provide other services to MGU. (*Id.* ¶¶ 15, 20.) Section 12 of the Clayton Act "properly confer[s] personal jurisdiction over a defendant only when the action is brought in the district where the defendant resides, is found, or transacts business, that is, the district where Section 12 venue lies." *Daniel v. Am. Bd. of Emergency Med.* ("*Daniel II*"), 428 F.3d 408, 427 (2d Cir. 2005) (quotation and citation omitted). The phrase "transacts business" refers to "the practical, everyday business or commercial concept of doing business or carrying on business of any substantial character."[26] *Id.*

---

[25] Because the Court concludes that Section 302(a)(1) does not confer jurisdiction over Defendant Frailly, it "need not consider whether if such jurisdiction were conferred it would offend notions of due process." *Mayes v. Leipziger*, 674 F.2d 178, 185 n.5 (2d Cir. 1982).

[26] Plaintiff does not rely on the "transacts business" standard, but argues, incorrectly, that venue under Section 12 of the Clayton Act lies "in a judicial district in which a substantial part of the events or omissions giving rise to the claim occurred." (Pl.'s Opp'n., Dkt. 63, at 31–32.) The "substantial part" standard advanced by Plaintiff applies to venue under 28 U.S.C. § 1391(b)(2), not Section 12 of the Clayton Act. *See Daniel II*, 428 F.3d at 430–34. While the general venue statute remains available to plaintiffs, where 28 U.S.C. § 1391 is the basis for venue, then the plaintiff still "must look to other service of process provisions, notably those specified in [Rule] 4 or incorporated therein from state law," to confer personal jurisdiction. *Daniel II*, 428 F.3d at 427.

at 428 (quoting *United States v. Scophony Corp. of Am.*, 333 U.S. 795, 807 (1948)).  To transact business of a "substantial character" requires "some amount of business continuity and certainly more than a few isolated and peripheral contacts with the particular judicial district."  *In re SSA Bonds Antitrust Litig.*, 420 F. Supp. 3d at 230 (citation omitted).

For example, "[a] defendant manufacturer that promotes its goods in a judicial district through product demonstrations, that solicits orders through its salesmen in that district, and that ships its goods into that district clearly 'transacts business' under Section 12."  *Daniel II*, 428 F.3d at 429 (citing *Eastman Kodak Co. of N.Y. v. S. Photo Materials Co.*, 273 U.S. 359, 374–77 (1927)).  *Compare Banana Distribs., Inc. v. United Fruit Co.*, 269 F.2d 790, 794 (2d Cir. 1959) (holding that the defendant that solicited orders, maintained offices, and provided customer assistance in the district transacted business there), *with City of Long Beach v. Total Gas & Power N. Am., Inc.*, 465 F. Supp. 3d 416, 433 (S.D.N.Y. 2020) (finding that the defendant that made filings with the New York office of the SEC, paid a settlement through a New York bank account, and made a "strategy presentation" in New York City did not transact business in the district).  In assessing whether a defendant "transacts business" within the district, the alleged contacts "must be considered in light of the nature of [the defendant]'s business."  *Daniel II*, 428 F.3d at 430.

Plaintiff has failed to make a *prima facie* showing that venue, and therefore personal jurisdiction under Section 12, is satisfied.  Plaintiff alleges that MGU is a Florida limited liability company,[27] with its principal place of business in Miami, Florida.  (SAC, Dkt. 30, ¶ 28.)  Because Plaintiff does not allege that MGU has "offices, employees, or any significant presence or

---

[27] As previously discussed, although the SAC alleges that MGU is a Florida limited liability company (SAC, Dkt. 30, ¶ 28), MGU states in its motion to dismiss that it is a Delaware limited liability company.  (MGU's Motion, Dkt. 52, at 3 n.1.)  In any event, MGU is not a New York limited liability company.

operations" in this district, MGU neither "resides" nor is "found" here.  *See City of Long Beach*, 465 F. Supp. 3d at 432.  The primary contacts Plaintiff alleges MGU to have with New York arise out of MGU's "negotiations" and "discussions" with "[P]laintiff's counsel in Nassau County," R&F, regarding Plaintiff's "initiative to be permitted to sell" products on Amazon and provide other services to MGU.  (*See* SAC, Dkt. 30, ¶¶ 15, 20; Pl.'s Opp'n., Dkt. 63, at 31–33, 39.)  However, these limited contacts, initiated by R&F, do not equate to MGU "carrying on business of any substantial character" in the district.  *See Daniel II*, 428 F.3d at 428; *see also In re SSA Bonds Antitrust Litig.*, 420 F. Supp. 3d at 230.  This is particularly true when these contacts are "considered in light of the nature of [MGU]'s business," *Daniel II*, 428 F.3d at 430, which is distributing and selling "French-made personal care products."  (SAC, Dkt. 30, ¶ 28).

Plaintiff does not allege facts to show that MGU's negotiations with R&F (or any other party in the district) contribute to or comprise a substantial portion of MGU distribution and sales business or revenue.  *See Daniel II*, 428 F.3d at 430 (finding that defendant did not "transact business" in the district by mailing an application to plaintiff where the nature of defendant's business was certifying doctors in emergency medicine, and the revenue from application fees in the district was *de minimis*); *see also Dennis v. JPMorgan Chase & Co.*, 343 F. Supp. 3d 122, 200 (S.D.N.Y. 2018) (finding that a defendant did not "transact business" in the district where the nature of defendant's business was banking and employee recruitment in the district did not comprise a substantial component of that business).[28]  Further, to the extent Plaintiff alleges that

_____

[28] Although the SAC refers to R&F as Plaintiff's counsel in "Nassau County" (SAC, Dkt. 30, ¶ 15), which is located in the *Eastern* District of New York, R&F's letterhead indicates that its office, at least as of the time of the relevant communications, was located at Madison Square Garden, 5 Penn Plaza, 23rd Fl., New York, NY 10001 (*see* Dkt. 67, at ECF 19; Dkt. 59, at ECF 4), which is in the *Southern* District of New York.  Therefore, it is not clear that even if MGU's contacts with R&F sufficiently demonstrated that MGU transacted business of a substantial character, that that business occurred in this district.

MGU transacts business in the district based on its sale of F&W goods to "New York residents" (SAC, Dkt. 30, ¶ 23), such allegations are unavailing, as Plaintiff has not alleged nor pled facts demonstrating that these sales have any connection to this district. *See City of Long Beach*, 465 F. Supp. 3d at 433.

Thus, Plaintiff has failed to make a *prima facie* showing that Section 12 venue, and therefore personal jurisdiction, is satisfied with respect to Defendant MGU. *See Daniel II*, 428 F.3d at 427.

### B.    New York Civil Practice Law and Rules Section 302(a)(1)

Plaintiff also alleges that Defendant MGU is subject to the personal jurisdiction of the Court under Section 302(a)(1) based on the following communications with New York-based R&F: (1) a June 27, 2018 letter on behalf of Plaintiff from R&F to MGU challenging and requesting withdrawal of three IP complaints against Plaintiff (Dkt. 7-8; Dkt. 67, at ECF 29); (2) a June 27 response from MGU[29] reiterating a previously conveyed compromise, *i.e.*, ■■■■■



■■■■ (Dkt. 67, at ECF 28); (3) a June 27 reply from R&F, on Plaintiff's behalf, ■■■■ ■■■■ (*id.* at ECF 27–28); (4) a June 29 follow-up from R&F requesting additional information about the complaints against Plaintiff (*id.* at ECF 27); (5) a June 29 response from MGU explaining ■■■■■■ ■■■■■ (*id.* at ECF 26–27); (6) a June 29 reply from R&F, on Plaintiff's behalf, requesting information about the basis

---

[29] For purposes of this analysis, the Court assumes that all responses from the "ecommerce" email address were made by or on behalf of MGU. (*See* Dkt. 67, at ECF 25.)

for the trademark complaint (*id.* at ECF 26); and (7) a July 3 follow-up from R&F again requesting information about the basis for the trademark complaint (*id.*). (*See* SAC, Dkt. 30, ¶ 15.)

In sum, MGU's email contacts with R&F over a span of six days were exclusively responsive and thus "not the type of interactions that demonstrate the purposeful availment necessary to confer personal jurisdiction over [] out-of-state defendants." *See Paterno*, 23 N.E.3d at 994; *cf. Fischbarg*, 880 N.E.2d at 28. These communications do not reveal any attempt by MGU to "*seek[] out and initiate[]* contact with New York, *solicit[]* business in New York, and *establish[]* a continuing relationship." *Paterno*, 23 N.E.3d at 993 (emphasis added). Quite the opposite. These communications reveal Plaintiff, through R&F, seeking out MGU and MGU providing limited responses to communications that happened to originate in New York. Such activity does not constitute transacting business in the state within the meaning of Section 302(a)(1).

Plaintiff also seems to allege that the Court has personal jurisdiction over MGU because New York residents "obtained information as to [F&W] products, and purchased such products" through MGU's "interactive Amazon storefront" called "Beauty Dreams." (SAC, Dkt. 30, ¶ 23.) When analyzing internet activity as the basis for jurisdiction under Section 302(a)(1), courts "typically look at 'the nature and quality of commercial activity that an entity conducts over the Internet.'" *Brady v. Anker Innovations Ltd.*, No. 18-CV-11396 (NSR), 2020 WL 158760, at *4 (S.D.N.Y. Jan. 13, 2020) (quoting *Best Van Lines, Inc. v. Walker*, 490 F.3d 239, 251 (2d Cir. 2007)). A "highly interactive" website that offers products for sale to New York consumers may demonstrate purposeful availment of the benefits of transacting business in New York. *See Chloe*, 616 F.3d at 170; *Lifeguard Licensing Corp.*, 2016 WL 3748480, at *3 ("A website that . . . allows customers to purchase goods online, is a 'highly interactive website,' which may provide a basis

for personal jurisdiction[.]")  Further, "[r]egularly offering and selling goods via an online marketplace such as Amazon.com can provide a basis for personal jurisdiction under CPLR § 302(a), even though [the defendants] do not control their Amazon.com 'storefront' or its interactivity to the same extent that they control their own highly interactive website." *Lifeguard Licensing Corp.*, 2016 WL 3748480, at *3 (citing *EnviroCare Techs., LLC v. Simanovsky*, No. 11-CV-3458 (JS) (ETB), 2012 WL 2001443, at *3 (E.D.N.Y. June 4, 2012)).

There is some uncertainty among courts in the Second Circuit as to whether a plaintiff must show that a defendant who operates an interactive website also made at least one sale to New York. *Compare Spin Master Ltd. v. 158*, No. 18-CV-1774 (LJL), 2020 WL 5350541, at *3 (S.D.N.Y. Sept. 4, 2020) (finding no personal jurisdiction where defendants offered products for sale to New York through a third-party online marketplace, but plaintiff "fail[ed] to evidence a 'single act' or 'transaction' in New York"), *with WowWee Grp. Ltd. v. Meirly*, No. 18-CV-706 (AJN), 2019 WL 1375470, at *4 (S.D.N.Y. Mar. 27, 2019) (noting that "the case law has stopped short of requiring additional conduct beyond maintaining an interactive website that offers products to consumers" and extending personal jurisdiction despite an absence of "proven sale").  However, it appears that the majority of cases to have analyzed Section 302(a)(1) jurisdiction over a defendant that used a highly interactive website to offer the sale of products to New York also involved evidence of actual sales to New York.  *See, e.g.*, *Chloe*, 616 F.3d at 170 ("[Defendant] engaged in fifty-two other transactions where merchandise was shipped to New York."); *Hypnotic Hats, Ltd. v. Wintermantel Enters., LLC*, No. 15-CV-6478 (ALC), 2016 WL 7451306, at *3 (S.D.N.Y. Dec. 27, 2016) ("Defendants have shipped numerous orders to consumers in New York."); *Lifeguard Licensing Corp*, 2016 WL 3748480, at *1 ("Defendants admit that the orders fulfilled by Amazon

were directed to New York locations"); *EnviroCare Techs., LLC*, 2012 WL 2001443, at *4 (Defendants sold "the allegedly counterfeit item to Plaintiff in New York[.]")

Here, Plaintiff alleges that MGU maintains a "fully-interactive online presence through its Amazon merchant store" known as "Beauty Dreams" through which New York residents purchased products. (SAC, Dkt. 30, ¶ 23.) Plaintiff does not allege facts regarding, nor provide proof of, any actual sales from the Beauty Dreams merchant store to consumers in New York. The Court agrees with the courts holding that where a plaintiff is alleging personal jurisdiction under Section 302(a)(1) based on defendant's operation of an interactive website and sale of goods into the state, the plaintiff must allege specific facts regarding, or provide "evidence [of,] a 'single act' or 'transaction' in New York." *See Spin Master Ltd.*, 2020 WL 5350541, at *3; *see also Chloe*, 616 F.3d at 170 ("[C]ourts have explained that section 302 is a single act statute and proof of one transaction in New York is sufficient to invoke jurisdiction[.]" (internal quotation and citation omitted)). However, the Court need not resolve this issue because, even if Plaintiff had demonstrated that MGU sold goods to a consumer in New York, such contacts with the state do not share a sufficient nexus with Plaintiff's claims to confer personal jurisdiction over Defendant MGU. None of the elements of Plaintiff's claims—which turn on an alleged conspiracy between MGU and Rivelle to eliminate price competition, an unreasonable restraint on trade, and interference with Plaintiff's relationship with Amazon (*see* discussion *supra*)—arise out of, or are more than tangentially connected to, MGU's "fully-interactive online presence" and sale of products to New York. *See Licci II*, 984 N.E.2d at 901. Any relationship between such contacts with New York and the causes of action is "merely coincidental," *see id.* at 900–01, and the Court finds that the causes of action would exist regardless of whether MGU sold products in New York, *see Beacon Enters., Inc.*, 715 F.2d at 765.

Thus, Plaintiff has also failed to make a *prima facie* showing that Defendant MGU is subject to the Court's personal jurisdiction under Section 302(a)(1).

### C.  Conspiracy Jurisdiction

Finally, the Court also rejects Plaintiff's claim that personal jurisdiction is imputed to MGU under a theory of conspiracy jurisdiction based on Defendant Frailly's alleged contacts with New York.  (*See* SAC, Dkt. 30, ¶¶ 15, 20–21.)  Even assuming that Plaintiff has adequately alleged the first two elements of conspiracy jurisdiction—that a conspiracy existed and that MGU participated in that conspiracy with Rivelle and Defendant Frailly—Plaintiff cannot satisfy the third element, requiring that "a co-conspirator's overt acts in furtherance of the conspiracy *had sufficient contacts with a state to subject that co-conspirator to jurisdiction in that state*."  *Charles Schwab Corp.*, 883 F.3d at 87 (emphasis added); *Rudersdal, EEOD v. Harris*, No. 18-CV-11072 (GHW), 2020 WL 5836517, at *8 (S.D.N.Y. Sept. 30, 2020) (explaining that the third prong of the *Schwab* test "requires both overt acts in furtherance of a conspiracy and that those acts subject the co-conspirator to jurisdiction in the forum").  For the reasons explained above, Defendant Frailly's contacts with R&F are not sufficient to subject him—the alleged co-conspirator—to personal jurisdiction.  Therefore, jurisdiction based on these contacts cannot be imputed to MGU.

For all of these reasons, Defendant MGU's motion to dismiss based on lack of personal jurisdiction is granted, and MGU is dismissed from this case.

### III.  Legal Sufficiency of the Allegations

The Court now addresses the legal sufficiency of Plaintiff's claims against Defendant Rivelle, which is not contesting personal jurisdiction.  *See Brown v. Lockheed Martin Corp.*, 814 F.3d 619, 625 (2d Cir. 2016) ("Unlike subject matter jurisdiction, 'the requirement of personal jurisdiction represents first of all an individual right, [and therefore] it can, like other such rights, be waived.'" (alterations in original) (quoting *Ins. Corp. of Ireland v. Compagnie des Bauxites de*

*Guinee*, 456 U.S. 694, 703 (1982))); *Actava TV, Inc. v. Joint Stock Co. "Channel One Russia Worldwide"*, 412 F. Supp. 3d 338, 348 (S.D.N.Y. 2019) ("[A]n entity may contract or stipulate with another to permit proceedings in a state's courts, notwithstanding the remoteness from the state of its operations and organization." (quoting *Brown*, 814 F.3d at 625)). Although Rivelle is the sole remaining Defendant, "alleged co-conspirators 'are not necessary parties [and] a plaintiff can prove the existence of a conspiracy in a[] [Sherman Act] action against just one of the members of the conspiracy.'" *See Spinelli v. Nat'l Football League*, 96 F. Supp. 3d 81, 104 (S.D.N.Y. 2015) (quoting *In re Cotton Yarn Antitrust Litig.*, 505 F.3d 274, 284 (4th Cir. 2007)); *see Georgia v. Pa. R.R. Co.*, 324 U.S. 439, 463 (1945) ("In a suit to enjoin a[n antitrust] conspiracy not all the conspirators are necessary parties defendant.").

### A.      The Antitrust Claims Are Dismissed For Failure to State a Claim

Plaintiff's first two causes of action allege violations of Section 1 of the Sherman Act, which "bans '[e]very contract, combination in the form of trust or otherwise, or conspiracy, in restraint of trade or commerce among the several States.'" *Mayor & City Council of Baltimore, Md. v. Citigroup, Inc.*, 709 F.3d 129, 135 (2d Cir. 2013) (quoting 15 U.S.C. § 1). As previously stated, to succeed in a Section 1 case, plaintiff must prove that the challenged conduct stems "from an agreement, tacit or express," and that the "common scheme . . . constituted an unreasonable restraint of trade" under the *per se* rule or the rule of reason. *Apple, Inc.*, 791 F.3d at 314–315, 320–21. Plaintiff advances claims under both rules. (*See* SAC, Dkt. 30, ¶¶ 86–104.)

### 1.      The *Per Se* Rule

Plaintiff alleges that the conduct of MGU and Rivelle—namely, acting by "joint collaborative action" to eliminate "discounters and discounted products" from the Amazon marketplace—constitutes a *per se* violation of Section 1. (SAC, Dkt. 30, ¶¶ 86–88.) Specifically, Plaintiff alleges that MGU and Rivelle acted in concert to "spread lies" about Plaintiff to Amazon in order to "preclude

[P]laintiff from competing or effectively competing to sell F&W products." (*Id.* ¶¶ 89– 90.)  As a result, Plaintiff lost profits due to its suspension from Amazon and was "coerced to cease selling F&W" products.  (*Id.* ¶¶ 92–93.)

Although "[t]he rule of reason is the accepted standard for testing whether a practice restrains trade in violation of § 1," certain kinds of market restraints "are deemed unlawful *per se*" and do not require case-specific analysis because they "always or almost always tend to restrict competition and decrease output . . . [and] have manifestly anticompetitive effects[.]"  *Leegin Creative Leather Prods., Inc. v. PSKS, Inc.*, 551 U.S. 877, 885–86 (2007) (alterations, quotations, and citations omitted); *see NYNEX Corp. v. Discon, Inc.*, 525 U.S. 128, 133 (1998) ("[C]ertain kinds of agreements will so often prove so harmful to competition . . . that the antitrust laws do not require proof that an agreement of that kind is, in fact, anticompetitive in the particular circumstances.").  "Agreements within the scope of § 1 may be either 'horizontal,' *i.e.*, 'agreement[s] between competitors at the same level of the market structure,' or 'vertical,' *i.e.*, 'combinations of persons at different levels of the market structure, *e.g.*, manufacturers and distributors.'"  *Anderson News, L.L.C. v. Am. Media, Inc.*, 680 F.3d 162, 182 (2d Cir. 2012) (quoting *United States v. Topco Assocs., Inc.*, 405 U.S. 596, 608 (1972)).  "Horizontal price-fixing conspiracies traditionally have been, and remain, the 'archetypal example' of a *per se* unlawful restraint on trade," *Apple, Inc.*, 791 F.3d at 321 (quoting *Catalano, Inc. v. Target Sales, Inc.*, 446 U.S. 643, 647 (1980)), while "vertical restraints—including those that restrict prices—should generally be subject to the rule of reason," *id.* (citing, *inter alia*, *Leegin*, 551 U.S. at 882).

Here, Plaintiff alleges a conspiracy between Defendants MGU and Rivelle based on the agreement they entered into, pursuant to which MGU, the exclusive United States distributor of F&W products, granted Rivelle, a third-party seller, the sole right to sell some of the products that

MGU distributed in North America on Amazon.  (*See* Dkt. 67, at ECF 4–12.)  This agreement is vertical, in that Rivelle, a seller, sourced products from MGU, a distributor.  *See Anderson News, L.L.C.*, 680 F.3d at 182 (explaining that a "vertical" agreement involves "combinations of persons at different levels of the market structure" (citation omitted)).  Plaintiff also alleges, however, that the Defendants had a horizontal relationship as competitors, in that MGU, through its "Beauty Dreams" merchant store on Amazon, competed with Rivelle for sales of F&W products.  (SAC, Dkt. 30, ¶ 53.)  Construing the pleadings in the light most favorable to Plaintiff, the Court accepts that Plaintiff has plausibly alleged some level of horizontal competition between MGU and Rivelle.  *See Anderson News, L.L.C.*, 680 F.3d at 182 (explaining that a "horizontal" agreement is "between competitors at the same level of the market structure" (citation omitted)).  Thus, the Court concludes that the relationship between MGU and Rivelle is *both* vertical and horizontal.

Defendant Rivelle argues that the *per se* rule does not apply here because (1) the only restraint on trade is vertical (*see* Rivelle and Frailly's Mem., Dkt. 54, at 8–9), and (2) the alleged conspiracy to eliminate price competition amounts to Rivelle and MGU advancing their "common economic interests—i.e., the protection of MGU's rights against unauthorized sellers," which is not *per se* unlawful (Rivelle and Frailly's Reply, Dkt. 68, at 2–5).  Plaintiff responds that Rivelle and MGU "are related *both* vertically and horizontally," and while it has "no complaint with [the] vertical, dual distribution agreement[]," it challenges the "horizontal competitors' agreement to eliminate competition," which should be subjected to the *per se* rule.  (Pl.'s Opp'n., Dkt. 63, at 10–14.)  The Court finds little support in law or in fact for Plaintiff's argument that the *per se* rule applies in this circumstance.  Plaintiff relies heavily on the Second Circuit's decision in *United States v. Apple, Inc.*, which affirmed the application of the *per se* rule to a hub-and-spoke

conspiracy to fix ebook prices.[30]  *See* 791 F.3d at 321–22.  There, the Circuit rejected, *inter alia*,

Apple's argument that it "engaged in 'vertical conduct' that is unfit for *per se* condemnation" when

it entered into "multiple independent, vertical agreements" with the six largest publishers of trade

books.  *Id.* at 298, 321–22.  The Circuit explained that "the relevant 'agreement in restraint of

trade' in this case is the price-fixing conspiracy [organized by Apple], not Apple's vertical

contracts with the [book publisher defendants]."  *Id.* at 325.  Plaintiff also relies on *Klor's, Inc. v.*

*Broadway-Hale Stores, Inc.*, which held that group boycotts are illegal *per se*.  359 U.S. 207, 212–

13 (1959).  There, the complaint alleged "a wide combination consisting of manufacturers,

distributors and a retailer" conspiring to deprive plaintiff, a retail store that sold appliances, of "its

freedom to buy appliances in an open competitive market[,] and [to] drive[] it out of business as a

dealer in the defendants' products."  *Id.* at 213.  Plaintiff, however, does not allege a hub-and-

spoke conspiracy, or a boycott involving a "wide combination" of actors, or a price-fixing

agreement[31]—making these cases inapposite.  Instead, Plaintiff alleges a conspiracy between two

---

[30] A "hub-and-spoke" conspiracy is one in which "an entity at one level of the market structure, the 'hub,' coordinates an agreement among competitors at a different level, the 'spokes.'"  *Apple, Inc.*, 791 F.3d at 314.  "These arrangements consist of *both* vertical agreements between the hub and each spoke and a horizontal agreement among the spokes 'to adhere to the [hub's] terms,' often because the spokes 'would not have gone along with [the vertical agreements] except on the understanding that the other [spokes] were agreeing to the same thing.'"  *Id.* (citation omitted).  In *Apple, Inc.*, the Second Circuit noted that "the 'hub-and-spoke' metaphor is somewhat inaccurate [because] the plaintiff must *also* prove the existence of a 'rim' to the wheel in the form of an agreement among the horizontal competitors."  *Id.* at 314 n.15.  As previously explained, MGU and Rivelle are two entities engaged in a relationship that is *simultaneously* vertical and horizontal, not a hub-and-spoke arrangement.

[31] In the SAC, Plaintiff "[d]oes not allege at this time, subject to discovery, that MGU had a formal [Minimum Advertised Price] policy to which 'authorized' sellers adhered," *i.e.*, price fixing.  (SAC, Dkt. 30, ¶ 6 n.4.)  Rather, as Plaintiff explains in its opposition, "[t]he instant conspiracy *isn't about vertical price fixing*, but rather, it's about horizontal competitors, i.e. defendants, destroying competition at the horizontal level—by blocking access to the Amazon platform—and thereby limiting output and effecting supra-competitive price levels within the

36

defendants that are, in Plaintiff's own words, "related both vertically and horizontally," and argues, citing no precedent, that this "hybrid conspiracy is not exempt from *per se* scrutiny." (*See* Pl.'s Opp'n., Dkt. 63, at 11–12; *see also* SAC, Dkt. 30, ¶¶ 53, 97.) The Court disagrees.

The Court is guided by a recent decision by the Honorable P. Kevin Castel in which he rejected the same argument Plaintiff's counsel attempts here, under comparable circumstances.[32] *See 2238 Victory Corp. v. Fjallraven USA Retail, LLC.*, No. 19-CV-11733 (PKC), 2021 WL 76334, at *3–6 (S.D.N.Y. Jan. 8, 2021). In *2238 Victory Corp.*, a third-party seller on Amazon, like Plaintiff, sued a manufacturer and another third-party seller, like Rivelle, which had become the manufacturer's exclusive authorized Amazon seller and also provided the manufacturer with "brand control and compliance" services. *See id.* at *1–2. The complaint characterized the defendants in *2238 Victory Corp.* as "simultaneously[] [having] a horizontal and vertical relationship," because while the manufacturer granted the third-party seller exclusive selling rights on Amazon, the manufacturer also competed for sales of its products through an online retail website. *Id.* at *4. The plaintiff alleged, as Plaintiff does here (almost verbatim), that the defendants had "colluded to limit competition on Amazon for the sale of [the manufacturer's] products" by "submitt[ing] counterfeiting complaints to Amazon," "resulting in [plaintiff's]

---

relevant market." (*See* Pl.'s Opp'n., Dkt. 63, at 13 (emphasis added)). In short, this case is not about price fixing.

[32] Indeed, Plaintiff's counsel here was also the plaintiff's counsel in Judge Castel's case. Additionally, Plaintiff's counsel unsuccessfully advanced a similar argument in a third case that was also brought on behalf of a third-party Amazon seller plaintiff, and also alleged Sherman Act violations based on an alleged conspiracy between the defendants to make complaints to Amazon about the plaintiff and thereby eliminate discount price competition. *Thimes Sols. Inc. v. TP Link USA Corp.*, No. 19-CV-10374 (PA) (EX), 2020 WL 4353681, at *8 (C.D. Cal. June 8, 2020). Although the facts in *Thimes* were somewhat different from the facts here, in that the defendants in that case did not have a vertical and horizontal relationship, the Court still feels compelled to caution Plaintiff's counsel that it is borderline sanctionable to continue to pursue antitrust theories and arguments that courts have repeatedly, and for good reason, rejected.

temporary suspension from Amazon and permanent ban from selling [the manufacturer's] products," and increasing the average price of the manufacturer's products on Amazon. *Id.* The *2238 Victory Corp.* plaintiff further alleged, as Plaintiff also does here, that this coordination by the defendants amounted to an "agreement between horizontal competitors to eliminate competition," which is a *per se* violation of the Sherman Act. *Id.* However, Judge Castel found that because the complaint expressly alleged that the manufacturer directly sold its products to consumers, in addition to having a distributorship relationship with the third-party seller on Amazon, *i.e.*, a simultaneous horizontal and vertical relationship, the defendants were engaged in a "dual distribution" arrangement that had to be analyzed under the rule of reason and was not subject to the *per se* rule. *Id.* at *5–6. Thus, in *2238 Victory Corp.*, Judge Castel specifically found that a relationship virtually identical to the one between MGU and Rivelle constituted a dual distribution arrangement that could not be subject to scrutiny under the *per se* rule.

Although the facts in this case differ slightly from those in *2238 Victory Corp.* in that MGU is the exclusive distributor, not the manufacturer, of the F&W products at issue and MGU competed with Rivelle for sales of F&W products on Amazon, not a separate retail website, these differences are immaterial. As previously explained, the alleged relationship between MGU and Rivelle, just as in *2238 Victory Corp.*, is both vertical and horizontal, and thus, as Judge Castel concluded in that case, is a "dual distribution" arrangement that is properly analyzed under the rule of reason. *See Elecs. Commc'ns Corp. v. Toshiba Am. Consumer Prods., Inc.*, 129 F.3d 240, 243 (2d Cir. 1997) (holding that "rule of reason" analysis applies "if the distributor and manufacturer also compete at the distribution level," *i.e.*, "the manufacturer distributes its products through a distributor and independently (so-called 'dual distribution' arrangements)"); *see also Beyer Farms, Inc. v. Elmhurst Dairy, Inc.*, 35 F. App'x 29, 29 (2d Cir. 2002) (summary order)

("[Plaintiff] alleged in its complaint that [defendants] were engaged in a dual-distributorship relationship, or both a vertical and horizontal relationship . . . [and thus] its complaint was subject to scrutiny under the 'rule of reason.'"); *Gatt Commc'ns, Inc. v. PMC Assocs., L.L.C.*, No. 10-CV-8 (DAB), 2011 WL 1044898, at \*2 (S.D.N.Y. Mar. 10, 2011) ("[C]laims alleging a vertical relationship or mixed vertical and horizontal relationships must be evaluated under the rule of reason."), *aff'd*, 711 F.3d 68 (2d Cir. 2013). This conclusion finds further support in the Supreme Court's caution that it is appropriate to adopt the *per se* rule only after "considerable experience with the type of restraint at issue," such that it can be "predict[ed] with confidence" that the restraint would almost always be invalidated as unreasonable. *Leegin*, 551 U.S. at 886–87 (citations omitted). Accordingly, "in the context of business relationships where the economic impact of certain practices is not immediately obvious," the Supreme Court has been reluctant to adopt a *per se* rule. *Id.* at 887 (quoting *State Oil Co. v. Khan*, 522 U.S. 3, 10 (1997)).

At its core, this case is about an alleged restraint on intrabrand competition, *i.e.*, competition for sales of F&W brand products, which, on the one hand, may have procompetitive effects, *see Leegin*, 551 U.S. 890–92; *K.M.B. Warehouse Distribs., Inc. v. Walker Mfg. Co.*, 61 F.3d 123, 127–28 (2d Cir. 1995) ("Restrictions on intrabrand competition can actually enhance market-wide competition by fostering vertical efficiency and maintaining the desired quality of a product."), and, on the other hand, may be unlawfully anticompetitive if it results in price-fixing or a seller cartel, *Leegin*, 551 U.S. at 892–94. "Because the effects of an intrabrand restraint can vary significantly, these restraints are scrutinized under the rule of reason and not categorized as unlawful *per se*." *2238 Victory Corp.*, 2021 WL 76334, at \*5 (collecting cases). This, in addition to recognizing the "dual distribution" arrangement alleged by Plaintiff, militates in favor of a case-specific reasonableness analysis, rather than a categorical *per se* judgment.

Therefore, Plaintiff's First Cause of Action, alleging a *per se* violation of the Sherman Act, is dismissed.

### 2.    The Rule of Reason

The Court now turns to Plaintiff's Second Cause of Action, which alleges a violation of the Sherman Act that is subject to the rule of reason.

The rule of reason is applied through "a three-step burden-shifting framework" under which the "plaintiff bears the initial burden of demonstrating that a defendant's challenged behavior had an *actual* adverse effect on competition as a whole in the relevant market."[33] *United States v. Am. Express Co.*, 838 F.3d 179, 194 (2d Cir. 2016) (internal quotation and citation omitted), *aff'd sub nom. Ohio v. Am. Express Co.*, 138 S. Ct. 2274 (2018).  At this first step, a plaintiff "must allege a plausible relevant market in which competition will be impaired." *City of New York v. Grp. Health Inc.*, 649 F.3d 151, 155 (2d Cir. 2011).  "In defining the market, courts examine both the relevant product and the relevant geographic markets." *N. Am. Soccer League, LLC v. U.S. Soccer Fed'n, Inc.*, 296 F. Supp. 3d 442, 470 (E.D.N.Y. 2017) (citing *PepsiCo, Inc. v. Coca–Cola Co.*, 315 F.3d 101, 105 (2d Cir. 2002)), *aff'd*, 883 F.3d 32 (2d Cir. 2018).  "The relevant [product] market is defined as all products 'reasonably interchangeable by consumers for the same purposes.'" *Geneva Pharms. Tech. Corp. v. Barr Lab'ys Inc.*, 386 F.3d 485, 496 (2d Cir. 2004) (quoting *United States v. E.I. du Pont de Nemours & Co.*, 351 U.S. 377, 395 (1956)).  The relevant market is defined in this way "because the ability of consumers to switch to a substitute restrains a firm's ability to raise prices above the competitive level." *Id.*  If the plaintiff fails to

---

[33] After Plaintiff satisfies this initial burden, "the burden [then] shifts to the defendant to offer evidence of any procompetitive effects of the restraint at issue," and finally, "the burden shifts back to the plaintiff to prove that any legitimate competitive benefits offered by defendant could have been achieved through less restrictive means."  *Am. Express Co.*, 838 F.3d at 195 (internal quotations, alterations, and citations omitted).

allege a relevant product market "with reference to the rule of reasonable interchangeability and cross-elasticity of demand, or alleges a proposed relevant market that clearly does not encompass all interchangeable substitute products . . . , the relevant market is legally insufficient." *Grp. Health Inc.*, 649 F.3d at 155–56 (quoting *Chapman v. N.Y. State Div. for Youth*, 546 F.3d 230, 238 (2d Cir. 2008)).

As best the Court can tell, Plaintiff alleges a relevant market defined as the market for F&W products on Amazon.[34] (*See* SAC, Dkt. 30, ¶¶ 94, 98; *see also id.* ¶¶ 58–59, 89; Pl.'s Opp'n., Dkt. 63, at 15 ("For purposes of [the rule of reason violation], Plaintiff has alleged a relevant product market for F&W products and a relevant national geographic market confined to the Amazon platform.").) Plaintiff offers extensive allegations about the "geographic market," alleging that anti-competitive conduct in the Amazon Marketplace—which allegedly controls at least 47% of all e-commerce in the United States—causes anti-competitive restraints in the nationwide e-commerce market. (*See* SAC, Dkt. 30, ¶¶ 38–43, 94–96.) However, Plaintiff wholly overlooks the requirement that it must allege a plausible *product* market that includes "all products reasonably interchangeable by consumers for the same purposes." *Geneva Pharms. Tech. Corp.*, 386 F.3d at 496 (quotation and citation omitted). The only products identified by Plaintiff as relevant here are F&W-branded products. (*See* Pl.'s Opp'n., Dkt. 63, at 15 ("In SAC ¶[]8 plaintiff alleges a certain line of F&W French-made personal care products as the relevant product.").)

---

[34] Plaintiff alternately identifies "relevant market of online ecommerce in the United States," as well as relevant "sub-markets" including "third-party ecommerce sales platforms in the United States," i.e., "Platform Service Market"; "Online sales of Fair & White Products," i.e., "Online F&W Products Market"; and "Online sales of Fair & White products on amazon.com," i.e., "Amazon F&W Products Market." (SAC, Dkt. 30, ¶ 94). Despite the incoherence of these myriad market definitions, it is clear to the Court—and fatal to Plaintiff's rule of reason claim—that the scope of the product market alleged by Plaintiff is limited to *one brand*, F&W, without consideration of all interchangeable substitute products. *See Grp. Health Inc.*, 649 F.3d at 155–56.

All facts plead by Plaintiff in support of its antitrust claims are limited to F&W products[35]—Plaintiff identifies Defendants MGU and Rivelle as competing "for sales of *F&W products*" (SAC, Dkt. 30, ¶¶ 23, 28 (emphasis added)), alleges that Plaintiff and other third-party sellers were "similarly driven from Amazon Marketplace competition for sales of *F&W products*" (*id.* ¶ 59 (emphasis added)), and alleges harm to consumers based on increasing prices and diminished stock for *F&W products* (*id.* ¶¶ 83–84, 104 (providing data on how "intrabrand competition for F&W products has lessened and consumers have paid more")). Thus, even construing the pleadings in Plaintiff's favor, it is evident that Plaintiff "alleges a proposed relevant market that clearly does not encompass all interchangeable substitute products." *See Grp. Health Inc.*, 649 F.3d at 155. Here, the alleged relevant market starts and ends with F&W-branded products, which is "legally insufficient." *See id.*; *Chapman*, 546 F.3d at 238 (affirming dismissal of antitrust claims where "plaintiffs' proposed relevant market does not encompass all interchangeable substitute products"); *see also Mathias v. Daily News, L.P.*, 152 F. Supp. 2d 465, 482 (S.D.N.Y. 2001) ("Th[e] failure to reference the rule of interchangeability is alone grounds for dismissal." (citation omitted)).

> Cases in which dismissal on the pleadings is appropriate frequently involve either (1) failed attempts to limit a product market to a *single brand*, franchise, institution, or comparable entity that competes with potential substitutes or (2) failure even to attempt a plausible explanation as to why a market should be limited in a particular way.

---

[35] The Court notes the allegation that "[t]he joint collaboration and decisions made by Defendants to eliminate competition at the retail sales level in the personal care products space were horizontal in parties, purpose and effect." (SAC, Dkt. 30, ¶ 53.) Although this points to a somewhat broader retail "space" or market, the facts alleged to support Plaintiff's antitrust claim relate solely to F&W products, as explained herein. Thus, Plaintiff does not allege a product market beyond a single brand.

*Todd v. Exxon Corp.*, 275 F.3d 191, 200 (2d Cir. 2001) (emphasis added) (collecting cases); *see, e.g.*, *Boneta v. Rolex Watch U.S.A. Inc.*, No. 16-CV-2369 (LGS), 2017 WL 2670752, at *4 (S.D.N.Y. June 21, 2017) (holding that an alleged product market for Rolex watches consisting of just Rolex watches was legally insufficient because "one brand does not constitute a relevant product market when the brand competes with potential substitutes"); *cf. U.S. Elecs., Inc. v. Directed Elecs., Inc.*, No. 06-CV-7899 (RMB), 2007 WL 9819273, at *5–6 (S.D.N.Y. Apr. 10, 2007) (finding that the overall Satellite Radio Products Market, rather than the *Sirius* Satellite Radio Product Market, was the relevant market "[i]n light of the general rule against limiting the 'relevant market' to a single brand"). Here, Plaintiff limits the relevant market to a single brand and offers no explanation—let alone a plausible explanation—why the relevant market should not be defined to include all interchangeable substitutes, such as, for example, other "personal care products" (*i.e.*, creams, soaps, and gel), of which F&W is just one of many brands. (*See* SAC, Dkt. 30, ¶ 28.) Accordingly, for this reason alone, Plaintiff's rule of reason claim must be dismissed.

Although the relevant market alleged by Plaintiff is inadequate to support an analysis of any anticompetitive effect, *see Laboratoires Majorelle SAS v. Apricus Biosciences, Inc.*, No. 17-CV-6625 (AT), 2018 WL 11222863, at *4 (S.D.N.Y. Sept. 21, 2018) ("Absent an adequate market definition, it is impossible for a court to assess the anticompetitive effect of challenged practices." (citation omitted)); *N. Am. Soccer League, LLC*, 296 F. Supp. 3d at 470 ("The determination of the relevant market is a 'necessary predicate' to analyzing antitrust claims under the rule of reason."), the Court nonetheless briefly addresses Plaintiff's framing of that analysis. In its opposition, Plaintiff argues that "[t]he question is whether the restraint to intrabrand competition plausibly harms consumers." (Opp'n., Dkt. 63, at 15–16.) This is incorrect. To prevail on a

Section 1 Sherman Act claim, the Second Circuit has explained that plaintiff must show "more than just an adverse effect on competition among different sellers of the same product ('intrabrand' competition)" because the focus of the inquiry "is the relevant market *as a whole*," which requires balancing any "restriction of intrabrand competition . . . against any increases in interbrand competition." *K.M.B. Warehouse Distribus, Inc.*, 61 F.3d at 127–28 (emphasis added); *see 2238 Victory Corp.*, 2021 WL 76334, at *5; *Abbott Lab'ys v. Adelphia Supply USA*, No. 15-CV-5826 (CBA) (LB), 2017 WL 5992355, at *5 (E.D.N.Y. Aug. 10, 2017). A plaintiff may demonstrate an adverse effect on market-wide competition through direct evidence of "increased prices and decreased quality" or, alternatively, by demonstrating that the defendant "had sufficient market power to cause an adverse effect on competition." *Virgin Atl. Airways Ltd. v. Brit. Airways PLC*, 257 F.3d 256, 264–65 (2d Cir. 2001) (citing *Tops Mkts., Inc. v. Quality Mkts., Inc.*, 142 F.3d 90, 96 (2d Cir. 1998)); *see Abbott Lab'ys*, 2017 WL 5992355, at *6. "Market power is defined as 'the ability of a single seller to raise price[s] and restrict output.'" *Virgin Atl. Airways Ltd.*, 257 F.3d at 265 (alteration in original) (citation omitted).

Here, Plaintiff alleges only increased prices and reduced outputs with respect to F&W products (*see* SAC, Dkt. 30, ¶¶ 83–84, 104), and does not allege any effects on price, quality, or outputs across brands in the personal care products market. To the extent the SAC can be read to include market power allegations, those allegations relate to Defendants' power and influence in the Amazon Marketplace over the price of F&W products (*see* SAC, Dkt. 30, ¶¶ 21–23, 26–28, 53–56, 58), and, by extension, across e-commerce nationwide (*see id.* ¶¶ 83–84, 95–96). There are, however, no allegations about Defendants' ability to impact price or output across brands in the personal care products market as a whole. Accordingly, for this reason as well, Plaintiff fails

to satisfy its initial burden under the rule of reason analysis and its Second Cause of Action must be dismissed.[36]  *See Am. Express Co.*, 838 F.3d at 194–95.

## B.    The Tortious Interference Claim is Dismissed

Having dismissed Defendants Frailly and MGU from this matter for lack of personal jurisdiction, and having dismissed both of Plaintiff's federal antitrust claims, the Court now considers Plaintiff's sole remaining cause of action for tortious interference with existing and prospective economic relations in violation of New York law.  Plaintiff alleges that the Court has supplemental jurisdiction, 28 U.S.C. § 1367, and diversity jurisdiction, 28 U.S.C. § 1332, over this remaining state law claim.  (SAC, Dkt. 30, ¶ 14.)

To start, Plaintiff has not adequately alleged diversity jurisdiction in this case.  For purposes of establishing diversity jurisdiction, the matter in controversy must exceed "the sum or value of $75,000, exclusive of interest and costs" and be between, *inter alia*, "citizens of different States."  28 U.S.C. § 1332(a).  Diversity jurisdiction "requires 'complete diversity,' *i.e.* all plaintiffs must be citizens of states diverse from those of all defendants."  *Finnegan v. Long Island Power Auth.*, 409 F. Supp. 3d 91, 95 (E.D.N.Y. 2019) (quoting *Pa. Pub. Sch. Emps.' Ret. Sys. v. Morgan Stanley & Co.*, 772 F.3d 111, 117–18 (2d Cir. 2014)).  An individual's citizenship is determined by his domicile, which is "the place where a person has his true fixed home and principal establishment, and to which, whenever he is absent, he has the intention of returning."

---

[36] Because Plaintiff withdrew its rule of reason claim in *2238 Victory Corp.*, the court did not need to reach the issue of whether that claim was sufficiently alleged.  2021 WL 76334, at *5 n.2.  However, Judge Castel noted that "such a claim likely would have been dismissed" because, *inter alia*, the complaint failed to coherently define a relevant product market, failed to describe any broader effect on the market in backpack sales (as opposed to sales of a particular backpack brand), and failed to identify any effect on *inter*brand competition.  *Id.*  For the reasons explained herein, Plaintiff's rule of reason claim suffers from virtually identical deficiencies, requiring dismissal of this claim.

*Palazzo ex rel. Delmage v. Corio*, 232 F. 3d 38, 42 (2d Cir. 2000) (quoting *Linardos v. Fortuna*, 157 F. 3d 945, 948 (2d Cir. 1998)). "[A] limited liability company is a citizen of each state in which its individual members are citizens." *U.S. Liab. Ins. Co. v. M Remodeling Corp.*, 444 F. Supp. 3d 408, 409 (E.D.N.Y. 2020) (citing *Castillo Grand, LLC v. Sheraton Operating Corp.*, 719 F.3d 120, 122 (2d Cir. 2013)). In pleading the citizenship of a limited liability company, "the identity and citizenship of *each member*" of the company must be specifically alleged. *Id.* at 410 (emphasis added). "[A] corporation shall be deemed to be a citizen of every State and foreign state by which it has been incorporated and of the State or foreign state where it has its principal place of business." 28 U.S.C. § 1332(c)(1).

Plaintiff alleges that the standard for diversity jurisdiction is satisfied "because no plaintiff and defendant are residents of the same state and the amount in controversy in this matter exceeds $75,000" (SAC, Dkt. 30, ¶ 14), however, Plaintiff failed to plead facts to adequately demonstrate the citizenship of the parties. Plaintiff is alleged to be "a Rhode Island domiciliary and limited liability company" (*id.* ¶ 25), but Plaintiff fails to specifically allege the identity and citizenship of each of its members. *See U.S. Liab. Ins. Co.*, 444 F. Supp. 3d at 409–10. Likewise, Defendant MGU is alleged to be "a Florida limited liability company with its domicile and principal place of business in Miami, Florida"[37] (SAC, Dkt. 30, ¶ 28), but again, Plaintiff fails to specifically allege the identity and citizenship of each of MGU's members. *See U.S. Liab. Ins. Co.*, 444 F. Supp. 3d at 409–10. Defendant Rivelle is alleged to be "a duly formed corporation, domiciled in California" (SAC, Dkt. 30, ¶ 26), but Plaintiff fails to allege the state(s) where Rivelle "has been incorporated"

---

[37] MGU is, in fact, a Delaware limited liability company. (MGU's Motion, Dkt. 52, at 3 n.1.)

and "has its principal place of business." *See* 28 U.S.C. § 1332(c)(1). Defendant Frailly's citizenship is not even addressed in the SAC.

Although Defendant Rivelle does not appear to challenge diversity jurisdiction in this matter (Rivelle and Frailly's Mem., Dkt. 54, at 13), "[a] federal court's lack of subject matter jurisdiction is not waivable by the parties" and must be addressed before reaching the merits. *Adames v. Taju*, 80 F. Supp. 3d 465, 467 (E.D.N.Y. 2015) (quoting *Holt v. Town of Stonington*, 765 F.3d 127, 130 (2d Cir. 2014)). Further, "[i]f subject matter jurisdiction is lacking and no party has called the matter to the court's attention, the court has the duty to dismiss the action sua sponte." *Durant, Nichols, Houston, Hodgson & Cortese-Costa P.C. v. Dupont*, 565 F.3d 56, 62–63 (2d Cir. 2009) (citation omitted). Plaintiff has failed to adequately allege the citizenship of each of the parties, and therefore has failed to adequately plead diversity jurisdiction. Accordingly, diversity jurisdiction does not provide a basis for the Court to consider Plaintiff's remaining state law claim.[38]

In addition, having dismissed Plaintiff's federal claims, the Court declines to exercise supplemental jurisdiction over Plaintiff's remaining state law claim. Section 1367(c) provides that a district court "may decline to exercise supplemental jurisdiction over a claim under [Section 1367(a)]" if, *inter alia*, "all claims over which it has original jurisdiction" have been dismissed. 28 U.S.C. § 1367(c). In determining whether to exercise supplemental jurisdiction, a court "should not decline jurisdiction 'unless it also determines that [exercising supplemental jurisdiction] would not promote the values . . . [of] economy, convenience, fairness, and comity.'" *Oneida Indian*

---

[38] Though it need not reach the issue, the Court also concludes that even if, *arguendo*, Plaintiff had adequately pled diversity jurisdiction, venue would not be proper in this district under 28 U.S.C. § 1391 (b), (c) and (d), as alleged by Plaintiff. (SAC, Dkt. 30, ¶ 18.) No Defendant resides in New York State, much less the Eastern District of New York, and, as explained herein, the events or omissions giving rise to Plaintiff's claims have little to no connection to this district.

*Nation of N.Y. v. Madison County*, 665 F.3d 408, 439 (2d Cir. 2011) (alterations in original) (quoting *Jones v. Ford Motor Credit Co.*, 358 F.3d 205, 214 (2d Cir. 2004)). Here, the claims over which the Court had original jurisdiction, *i.e.*, the federal antitrust claims, have been dismissed, and the only remaining claim arises under New York state law. This claim does not implicate any federal issues or doctrines and will require application of state law. Additionally, the lawsuit is still in the early stages; aside from limited discovery into jurisdictional issues, discovery has not begun in earnest. Thus, the Count concludes that neither economy, convenience, fairness, nor comity weigh in favor of exercising supplemental jurisdiction. *See 2238 Victory Corp.*, 2021 WL 76334, at *6 (declining to exercise supplemental jurisdiction over tortious interference and libel claims under New York law after dismissing federal antitrust claim). Plaintiff's remaining claim for tortious interference with existing and prospective economic relations is therefore dismissed.

## IV.    Plaintiff's Venue-Transfer Request Is Denied

Finally, the Court denies Plaintiff's last-ditch request for the Court to transfer venue to the Southern District of Florida rather than dismiss the case. Plaintiff argues that "SDFL is most suitable as an alternate forum" because "MGU and its staff are located in SDFL, as are counsel for both [P]laintiff and MGU." (Pl.'s Opp'n., Dkt. 63, at 41–42.) Under 28 U.S.C. § 1404(a), "[f]or the convenience of parties and witnesses, in the interest of justice, a district court may transfer any civil action to any other district or division where it might have been brought or to any district or division to which all parties have consented." 28 U.S.C. § 1404. "The decision to transfer an action 'lies within the sound discretion of the district court,'" *Tobey v. Nat'l Action Fin. Servs., Inc.*, No. 09-CV-1917 (ARR) (JMA), 2009 WL 3734320, at *2 (E.D.N.Y. Nov. 4, 2009) (quoting *Minnette v. Time Warner,* 997 F.2d 1023, 1026 (2d Cir.1993)), upon consideration of several factors, including:

(1) the convenience of witnesses; (2) the availability of process to compel the attendance of unwilling witnesses; (3) the convenience of the parties; (4) the locus of operative facts; (5) the location of relevant documents and relative ease of access to sources of proof; (6) the relative means of the parties; (7) the forum's familiarity with the governing law; (8) the weight accorded the plaintiff's choice of forum; and (9) trial efficiency and the interests of justice, based on the totality of circumstances[,]

*Vida Longevity Fund, LP v. Lincoln Life & Annuity Co. of N.Y.*, No. 19-CV-6004 (ALC) (DF), 2020 WL 4194729, at *5 (S.D.N.Y. July 21, 2020) (citation omitted). Ultimately, the party moving for transfer bears the "burden of demonstrating the appropriateness of transfer by clear and convincing evidence." *Tobey*, 2009 WL 3734320, at *2. Plaintiff has plainly failed to meet this burden here, offering little to no evidence that would inform the Court's consideration of the factors or convince the Court that transfer to the Southern District of Florida would be "for the convenience of the parties" or "in the interest of justice." *See* 28 U.S.C. § 1404. Moreover, at this point, for the reasons already stated, the Court is "[w]ithout subject-matter jurisdiction" and therefore "is without power to effect the relief [Plaintiff] seek[s], *i.e.*, transfer of venue." *Yun Chi v. Parajon*, No. 20-CV-9042 (PAE), 2020 WL 6700584, at *2 (S.D.N.Y. Nov. 13, 2020) (finding that because "plaintiffs have failed to plead facts sufficient to establish that the Court has subject-matter jurisdiction over this action, the Court is constrained to deny plaintiffs' motion to transfer"); *see Findwhat.Com v. Overture Servs., Inc.*, No. 02-CV-447 (MBM), 2003 WL 402649, at *3 (S.D.N.Y. Feb. 21, 2003) ("Before a district court can consider a motion to transfer, it must determine whether it has subject-matter jurisdiction."). Therefore, Plaintiff's request to transfer venue is denied.

## CONCLUSION

Defendant Frailly's motion to dismiss based on lack of personal jurisdiction is granted. Defendant MGU's motion to dismiss based on lack of personal jurisdiction is also granted. Defendant Rivelle's motion to dismiss the *per se* and rule of reason antitrust causes of action for

failure to state a claim is granted.  The Court also dismisses Plaintiff's state law claim for tortious interference with existing and prospective economic relations because Plaintiff fails to sufficiently allege diversity jurisdiction and because the Court declines to exercise supplemental jurisdiction over that claim.  Finally, the Court denies Plaintiff's request for transfer of venue.  The Clerk of Court is respectfully directed to enter judgment for Defendants and close the case.

SO ORDERED.

*/s/ Pamela K. Chen*
Pamela K. Chen
United States District Judge

Dated: March 31, 2021
        Brooklyn, New York